## Bailey et al. v. Gordon et al.

412

*Weiss, Rhoads & Simon,* for plaintiffs.

*T. McKeen Chidsey,* Attorney General, *H. Albert Leberman,* Deputy Attorney General, and *Metzger & Wickersham,* for defendants.

RICHARDS, P. J., November 9, 1948.—This case comes before us on exceptions to the chancellor's opinion and decree nisi dismissing the bill of plaintiffs.

The Pennsylvania Game Commission, hereinafter referred to as the commission, published advertisements in a newspaper inviting sealed bids for the purchase of strippable coal underlying game lands: Plaintiffs' Exception No. 1. The location of the land was given and the acreage stated to be approximately 75 acres. Envelopes containing bids were to be marked "Coal Bid—Open Aug. 14, 1947". Proposal forms and other information desired by bidders were stated to be available at the office of the commission. The entire area stripped was required to be back-filled, leveled and planted. A substantial advance royalty deposit in cash was required to be paid before stripping operation should begin. When the advance royalty payment became exhausted, monthly cash royalty pay-

ments were to be made. The commission reserved the right to reject any and all bids and to award the contract as deemed for its best interests.

The "Information for Bidders" reiterated these matters and stated that the successful bidder "shall execute a contract and bond in substantially the form attached". The proposal form required the bidder to indicate the number of tons per month on which royalty would be paid, said tonnage to be not less than 2,000 tons per month, whether mined or not. Copies of the suggested bond and lease were also attached.

But two bids were received in response to the advertisement. One was submitted by John Morroni, Fred R. Korman et al., a partnership, hereinafter referred to as the Korman partnership. This proposal was for a 10-year lease at the rate of $.426 per ton, royalty to be paid on not less than 2,000 tons per month, whether mined or not, and an advance payment of royalty in the amount of $860 was offered. The other bid was submitted by Robert A. Williams. His proposal was for a 10-year lease at the rate of $.25 per ton, royalty to be paid on not less than 1,000 tons per month, whether mined or not, and an advance payment of royalty in the amount of $15,000 was offered.

The commission, instead of letting the contract or rejecting all bids, entered upon a series of negotiations which resulted in the execution of a contract between the commission and Robert A. Williams, trading and doing business as the Williams Coal Mining Co., which we shall hereafter refer to as Williams. This contract varied in a number of respects from the proposal and suggested lease, as will hereinafter be explained.

The present bill was then filed seeking to restrain the commission and Williams from carrying out the contract and directing the commission to award the contract to the Korman partnership. An answer was filed which, inter alia, paragraph 3, denies that the

advertisement "constituted a legal offer to persons to submit bids". The chancellor handed down his opinion and decree nisi, the latter dismissing the bill. Exceptions were then filed by plaintiffs and argument heard by the court en banc.

The positions of the respective parties may be briefly stated as follows: Plaintiffs contend that the contract must be let to the highest responsible bidder, which they say is the Korman partnership. Defendants say they made no proposal for a legal contract, but invited suggestions which might result in the negotiation of a contract at the sole and unlimited discretion of the commission.

### Discussion

Section 906 (c) of The Game Law of June 3, 1937, P. L. 1225, as amended by the Act of May 9, 1947, P. L. 183, 34 PS §1311.906, reads as follows:

"The Commission, subject to the approval of the Governor, may sell or lease minerals or oil or gas on, in and under lands for which title has been acquired for its use when such disposition appears to the Commission to be for the best interests of the Commonwealth: Provided, however, That when the estimated value of such minerals or oil or gas exceeds five hundred dollars, the proposed sale or lease shall be advertised at least once a week for three successive weeks in two or more newspapers published in the general locality of the lands in question."

Under the terms of this section it must first be determined as a matter of policy that the sale or lease of natural resources is for the best interests of the Commonwealth. The commission is vested with discretion to make this determination, subject to the approval of the Governor. It follows, as a necessary corollary, that it must be determined what is to be sold or leased. This, of course, cannot be decided without a description of the land on which the resources to be sold or leased

are located. Consequently, the initial determination involves a decision to sell or lease certain specified natural resources on a designated piece of land. Without such a determination there could be no proposed sale or lease.

The matter of policy having been determined, the next step is to effect the proposed sale or lease. When the value of the resources to be sold or leased does not exceed $500, no public notice thereof is required by the act. But, when the value exceeds $500, the proposed sale or lease must be advertised in two or more newspapers. What is the significance of this requirement?

It seems to be the opinion of the commission that the act does not require competitive bidding; that the sole purpose of the advertising is to inform the public that the commission is considering the sale or lease of resources under the general terms formulated by it, but that under no circumstances could a bidder be entitled to an award of the contract, since, as it says, the commission has unlimited discretion, even after bids are received, to negotiate a contract, the terms of which may or may not conform to its own original proposal. That this is the contention of the commission is clearly shown by the advertisement which states that it "reserves the right to reject any and all bids, and to award the contract as deemed for its best interests". It is also shown by the answer to the bill, and by the briefs of counsel for defendants. This seems to be a rather anomalous position in view of the fact that the advertisement is headed "Bids invited for coal lease", and that the first sentence reads: "Sealed bids for the purchase . . . of strippable coal . . . are invited. . . ." The "Information for Bidders" states that: "Sealed bids will be received . . . for the sale of strippable coal. . . ." It would be illusory to advertise a "proposed sale or lease" if no sale or lease was in fact proposed. It would be vain to advertise at all if the com-

mission has complete and untrammeled discretion, both before and after advertising, to negotiate a lease with any person at all upon such terms as it deems expedient. The conditions of bidding as outlined in the advertisement, in the "Information for Bidders" and in the suggested lease would be meaningless. The proviso that proposed sales or leases of resources exceeding $500 in value should be advertised would, in effect, be deleted from the act by a construction holding that the discretion of the commission is paramount at all times, regardless of the value of the resources, and **regardless of the bids.**

It will be observed that the above quoted section of the act does not mention either the word "bid" or the word "contract". However, there can be no sale or lease without a contract. Hence, the direction to advertise a proposed sale or lease is a direction to advertise for bids on a proposed contract. In the absence of a more specific statutory requirement we are thrown back upon general principles. Among these is the necessity of open competitive bidding on public contracts when required by statute or construction. There can be no open competitive bidding without a common standard on which to base bids. A variable standard such as that for which the commission here contends is not productive of competitive bidding. When the common bidding standard is established, it is the duty of all public officers to get the best possible bargain for the public which they represent. These principles are in the interest of good government and operate as a protection against frauds and favoritism. Assuming a common bidding standard, the best bid should be accepted. The best bid is not always the highest or lowest monetary bid, as the case may be. It may be determined by consideration of other factors, such as responsibility or ability to perform. But when two or more bidders are equally responsible, and equally

able to perform, and when they are bidding on the same thing, as embodied in a common bidding standard, the best interests of the Commonwealth require that the bid be let to that one whose offer affords the greatest advantage to the Commonwealth. Public contracts may not be awarded capriciously: Summit Hill School Directors Removal, 289 Pa. 82, 85; Kratz et al. v. Allentown et al., 304 Pa. 51, 54; Brener v. Philadelphia et al., 305 Pa. 182, 186.

It follows, therefore, that the commission, subject to the approval of the Governor, has practically unlimited discretion to determine whether or not to sell or lease resources on game lands. After it has been decided to sell or lease resources exceeding $500 in value, there must be open, competitive bidding. The discretion of the commission thereafter is limited: (1) To the rejection of all bids for inadequacy of consideration, when such right has been reserved, or (2) To determination of the best bid or the highest responsible bidder.

In the present case there was no rejection of any or all bids for inadequacy. Neither was there any determination of the best bidder or highest responsible bidder under the specifications. Instead the bids were considered as but leads to persons with whom a contract might be negotiated, regardless of the specifications. The contract was let to Williams on this theory.

In support of what we have said about public contracts, we direct attention to certain legal authorities:

"Whether a contract for public work . . . is to be entered into through private negotiations or only after competitive bidding is a matter of statutory provision *and construction*": 43 Am. Jur. 765, §24. (Italics supplied.)

". . . Advertisements for bids must be sufficiently specific to enable contractors to make intelligent bids and proposals for the performance of the proposed

contract, and a contract cannot be lawfully awarded when changes are made in the specifications after advertisement unless the change is advertised": 59 C. J. 176, §297. To the same effect, see Louchheim v. Phila., 218 Pa. 100, 103, 104; Flinn v. Phila., 258 Pa. 355, 361; Page v. King, 285 Pa. 153, 160, and Guthrie v. Armstrong, 303 Pa. 11, 17.

Unless the opportunity for competitive bidding, an inseparable element in all such contracts, is present, a public contract cannot be lawfully let: Dolan et al. v. Schoen et al., 261 Pa. 11; Taylor v. Phila., 261 Pa. 458. " 'The term "lowest bidder" implies a common standard under which all bids may be received. That common standard implies previously prepared specifications, freely accessible for all competitors; on these alone shall their bids be based . . .' ": Page v. King, 285 Pa. 153, 156; quoted by Rupp, J., in Shireman v. Scott, 53 Dauph. 19, 24.

The intent of provisions "regulating the awarding of public contracts, is to secure . . . the benefit and advantage of fair and just competition between bidders, and at the same time close, as far as possible, every avenue to favoritism and fraud in its varied forms": Mazet v. City of Pittsburgh et al., 137 Pa. 548, 561.

"How can there be a *lowest* bidder, when parties proposing to bid are instructed to prepare their own specifications and submit them with their respective bids?": Mazet v. City of Pittsburgh, 137 Pa. 548, 563.

"If the director had the power to enter into *private negotiations* with a contracting firm for the purpose of reducing its original bid submitted at the time of the *open competition*, it would necessarily follow that he would have the same power to allow the bidder to increase the amount of his bid submitted at the public letting. If such a rule is to be established it must be held to work both ways, and this would lead to favorit-

ism and fraud in its varied forms which the courts have said must not be allowed": Louchheim v. Philadelphia, 218 Pa. 100, 103. (Italics supplied.)

The discretion involved in determining the lowest responsible bidder is discussed in Hibbs v. Arensberg, 276 Pa. 24, at page 29. This is a leading case, but in the interest of brevity we shall not quote from it.

An act provided that when it was proposed to contract for a plant to cost $5,000 or more, notice should be published of intention to adopt proposed plans and specifications. The court in considering this requirement said:

"It is obvious . . . that the Legislature intended to require competitive bidding upon all public contracts of this nature costing over $5,000."

It then quoted the following: " '*Unless the bid respond to the proposal in all material respects it is not a bid at all, but a new proposition*' ": Iowa-Nebraska L. & P. Co. v. City of Villisca, 220 Iowa 238, at page 248, 261 N. W. 423.

The late Judge Hargest of this court, although dealing with a case where the statute did not require an award to the lowest responsible bidder after advertisement, stated as follows:

"It necessarily follows that the Liquor Control Board is not required to invite bids as a condition precedent to the awarding of such a contract (warehouse storage) ; but having invited bids, we are of opinion that public policy and the economical conduct of governmental business require that the contract should be awarded to the lowest responsible bidder": Sullivan v. Liquor Control Board, 42 Dauph. 323, at page 328.

We fully realize that some of these statements are made in cases having factual bases differing from those in the instant case. We believe, however, that they correctly state the law by which we must be guided.

As shown above, the whole problem involves construction of the statute involved and considerations of public policy.

Bearing these principles in mind, we will consider the facts in the present case.

The advertisement states that a substantial advance royalty deposit in cash shall be paid before the stripping operation may be started. This could well be a very important consideration for bidders. Yet the proposal form fails to show what is required as an advance royalty payment. No sum is given, no percentage fixed. The whole matter is left to the bidder. Nevertheless, the commission has given as one of its reasons for executing a contract with Williams the fact that he offered $15,000 as an advance royalty payment, whereas the Korman partnership offered but $860.

Both the advertisement and the "Information for Bidders" asked for bids for strippable "A" seam coal. The form of lease prepared for the use of bidders covers all strippable coal on the land in question. The record is silent as to whether or not there is any strippable coal on the tract in addition to the "A" seam coal. Failure to clarify this, it seems to us, makes it impossible for a bidder to know what he is expected to bid upon.

These two matters are fatal defects. They are important factors for the consideration of bidders. They may affect their ability to perform the suggested contract and thus deter them from bidding. There is, in this respect, no common bidding standard. Possibly this explains why there were but two bids.

The next consideration is the bids. The Korman bid is in substantial compliance with the standards set up by the commission. It is true that it states that one section of the lease needs clarifying. This could easily be done without making any substantial change.

However, since the bidding standard was defective, and this is a taxpayers' bill, we feel that the contract may not properly be awarded to this partnership.

The Williams bid did not conform to the bidding standard in two important respects: (1) The monthly royalty payment was reduced from the standard of 2,000 tons per month to 1,000 tons per month; (2) a provision was inserted providing that the lessee may cancel the lease upon giving 30 days' notice to the lessor. The latter is in flat violation of the lease prepared by the commission for the use of bidders, which requires the lessee to mine to exhaustion: Paragraph 10. No cancellation clause was contained in the lease submitted to bidders, and for failure to complete the contract all advance payments of royalty were forfeited as liquidated damages: Paragraph 3. Surely no award could be made on this bid for the reason that there was a fatal variation from the standards set up.

The actual contract awarded to Williams not only embodied the proposed reduction in the monthly royalty payments, and the cancellation clause, aforesaid, but in addition it reduced the acreage to be mined from 75 acres to 15 acres, a reduction of 80 per cent. This is a flagrant violation of the bidding standard, and a flat change of the thing proposed to be sold or leased. Some persons interested in a 75-acre project might not be interested in a 15-acre project, and vice versa. It can scarcely be contended that the contract let, incorporating these three important changes, complied with the bidding standard, or that it did not involve substantial changes in the proposed lease.

Furthermore, the Williams lease provided that should the 15 acres fail to produce 60,000 tons of strippable coal, the area to be strip mined should be expanded by an acreage which, when added to the original 15 acres, would produce 60,000 tons of coal.

In addition, upon compliance with the terms of the contract, it allowed an additional five acres to be strip mined. Among the terms of the contract was also a provision that the lessee should level and plant an adjoining tract of 35 acres previously strip mined by him.

None of these provisions appear in the original proposal of the commission, although the twenty-seventh paragraph of the lease states: "This lease is pursuant to advertisement for bids. . . ." In these additional aspects, therefore, it is obvious that the contract was not let after open competitive bidding on a common bidding standard.

We have not discussed the so-called escape clause in connection with the Korman partnership. The escape clause was a provision intended to relieve the lessee of liability to strip mine when the overburden exceeds 30 feet in depth, or consists of nonfriable material. We have not discussed it because it formed no part of the original bid, but was discussed only in the negotiations which followed. Had the bidding standard been proper, the escape clause might properly have been included in the lease to define strippable coal. Such a definition would not, in our opinion, have constituted a material or substantial variation in the lease, but would have served merely to clarify the same.

It is a well known fact that it is impracticable and not economically feasible to strip mine an area where the overburden is too deep or consists of nonfriable material. This was brought out in Dufour v. Maize et al., 358 Pa. 309.

Having arrived at these conclusions, it is unnecessary to consider whether or not the contract was let to the best bidder or to the highest responsible bidder. . . .

## Conclusions of Law

1. The commission, by and with the approval of the Governor, has discretion to decide as a matter of policy that resources on game lands may be sold or leased.

2. Having so decided, the commission must advertise its intention to sell or lease the resources, when the value thereof exceeds $500.

3. The purpose of the advertising is to secure the best possible bargain for the Commonwealth, after open competitive bidding.

4. When the sale or lease relates to resources exceeding $500, a common bidding standard must be prepared.

5. The bidding standard in the present case was defective for the reasons heretofore given.

6. Upon compliance with a proper bidding standard, the contract must be awarded to the highest and best bidder or to the highest responsible bidder, unless all bids are rejected in accordance with the right reserved to do so in the invitation.

7. An award to the Korman partnership was properly refused in the present case because there was no proper bidding standard.

8. The Williams bid and award were improper for the reasons heretofore stated.

9. The commission does not have discretion to negotiate a contract after advertising for bids.

10. The commission does have discretion to determine the highest and best bid or the highest responsible bidder.

11. The contract entered into by the commission and Williams is null and void.

12. An injunction should issue restraining defendants from executing the Williams contract.

13. The costs of this proceeding should be paid by defendants.

*Final Decree*

And now, to wit, November 9, 1948, the exceptions are sustained to the extent heretofore noted. In all other respects they are dismissed. Defendants are hereby perpetually enjoined and restrained from performing the aforesaid Williams contract and are hereby directed to pay the costs of this proceeding.