RALPH L. PATSCH, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 27437, 27438, 27439, 29606, 29609, 29610, 29607, 29608, 29611. Promulgated November 10, 1952.

*Charles L. Albright, Jr., Esq.*, for the petitioners.
*Albert J. O'Connor, Esq.*, for the respondent.

[1] Proceedings of the following petitioners are consolidated herewith: C. W. Patsch, J. Glenn Patsch, C. W. Patsch, Ralph L. Patsch, J. Glenn Patsch, J. Glenn Patsch and Wilma Patsch, C. W. Patsch and Eva Patsch, and Ralph L. Patsch and Eulala Patsch.

193

OPINION.

ARUNDELL, *Judge:* The primary question for decision in these proceedings is whether Patsch Brothers Coal Company is entitled to deduct as an accrued expense for the years 1946, 1947, and 1948 the estimated cost of backfilling lands from which it stripped coal in those years. If it is entitled to the deduction, there is a further question of whether it may deduct an additional amount for the year 1946 by reason of having underestimated for that year the cost of backfilling the Allison Farms tract. Other issues raised by the pleadings have been settled by stipulation.

Patsch Brothers Coal Company was a partnership which was engaged in the business of mining coal in Pennsylvania by the open pit or strip-mining method. Its books were kept and returns filed on the accrual method of accounting. It accrued on its books reserves, computed on the basis of tonnages of coal mined, which were intended to cover the cost of backfilling the areas from which coal was mined in each year. The amounts of such reserves were claimed as deductions from gross income in the partnership returns of income. The respondent disallowed such deductions, but he allowed deductions for

the amounts actually expended for backfilling in the years 1947 and 1948.

The partnership conducted mining operations under leases which required it to conform to the laws of the Commonwealth of Pennsylvania concerning strip-mining operations. Under four of the leases the partnership was further required to backfill so as to restore the original contour of the mined areas as nearly as possible.

Both parties assume that the partnership in its operations was subject to the provisions of the Bituminous Coal Open Pit Mining Conservation Act [4] of the Commonwealth of Pennsylvania. That statute requires the operator of a strip-mine to file with the Department of Mines a certificate giving certain information as to its operations and also to file a bond conditioned on performance of all of the requirements of the act. (Sec. 1396.4.) [5] Operation and completion reports are required to be filed, and if operations are not completed within a year after registration, annual reports must be filed. (Secs. 1396.5, 1396.6, 1396.7.) Section 1396.10 provides that within one year after completion of an operation "the operator shall place sufficient overburden or earth not containing reject coal or combustible material in the open cut to cover the exposed face of the unmined coal" and specifies how the covering shall be done. That section also requires that the peaks and ridges of spoilbanks be leveled and rounded off to an extent to permit the planting of trees, grasses, or shrubs, except where it is proposed to conduct drift mining operations. Other sections provide for the planting of trees, shrubs, or grasses under supervision of the Secretary of Forests and Waters, release of performance bond, and forfeiture of the bond or deposit in the event of default in compliance with the statute. Mining without registration is a misdemeanor and punishable by a fine. (Secs. 1396.11–16.)

The petitioners contend that the removal of the coal by the partnership was an event which created a liability to backfill under the provisions of the leases under which it operated, its performance bond, and the laws of Pennsylvania. They argue that as soon as any overburden was removed there was a definite, fixed, and existent obligation to backfill, though as a practical mining procedure backfilling is not done until the particular tract involved is completely mined.

For statutory support for their position the petitioners cite Internal Revenue Code sections 41 and 43 which provide that "The net income shall be computed * * * in accordance with the method of ac-

---

[4] 52 P. S. sections 1396.1–1396.20. The constitutionality of the statute was determined in Dufour v. Maize, 358 Pa. 309, 56 A. 2d 675 (1948).

[5] An operator is defined in section 1396.3 as follows :

"Operator" shall mean a person, firm, corporation or partnership engaged in open pit mining, as a principal as distinguished from an agent or independent contractor, and, who is or becomes the owner of such coal as a result of such mining.

counting regularly employed in keeping the books  \*  \*  \*" and that "\*  \*  \*  deductions and credits  \*  \*  \*  shall be taken for the taxable year in which 'paid or accrued' or 'paid or incurred', dependent upon the method of accounting upon the basis of which the net income is computed, unless in order to clearly reflect the income the deductions or credits should be taken as of a different period." Their view is that under these provisions of the Code, and sound accounting practice, accrual of estimated costs of backfilling was proper for the years in which coal was removed.

The respondent's position is that neither the fact nor the amount of liability had been fixed by events that occurred during the taxable years. He argues that the requirements of the existence of a liability and its amount will be met in these cases only when the backfilling work has actually been performed.

It is our conclusion that the respondent properly disallowed the claimed deductions for the reserves for backfilling. The mining of the coal by the partnership was not an event which fixed within the year the partnership's liability to pay. Further, the amount of the partnership's liability, if any, has not been established with sufficient certainty to support an accrual.

The factual situations under which deductions are permissible in advance of payment for items allowable by statute, such as taxes, expenses, losses, and interest, have often been stated. Such deductions are allowable to a taxpayer who accounts on the accrual method where, within the taxable year, all events have occurred which (a) establish the existence of a definite *liability* of the taxpayer *to pay* and (b) fix the *amount* of such liability.[6] On the other hand, no deduction is allowable in a year where not all events have occurred which establish a liability to pay, or where the amount of the liability is uncertain because of an existent contingency.[7]

Among the cases in the latter category, and closely in point factually with those before us, is *Spencer, White & Prentis* v. *Commissioner*, 144 F. 2d 45, affirming a Memorandum Opinion of this Court in which we disallowed a deduction for a reserve for the estimated cost of restoration of property in connection with the construction of a subway. The restoration work was not performed in the year of the creation of the reserve and the claim for deduction, but was

---

[6] Among the leading cases on this point are *Anderson* v. *United States*, 269 U. S. 422; *American National Co.* v. *United States*, 274 U. S. 99; *Uncasville Mfg. Co.* v. *Commissioner*, 55 F. 2d 893.

[7] The contingency may be in the form of pendency of litigation to establish liability for breach of contract and amount of damages, *Lucas* v. *American Code Co.*, 280 U. S. 445; litigation concerning liability for state taxes, *Dixie Pine Products Co.* v. *Commissioner*, 320 U. S. 516; litigation as to Federal excise taxes, *Security Flour Mills Co.* v. *Commissioner*, 321 U. S. 281; prospective cancellation of insurance contracts, *Brown* v. *Helvering*, 291 U. S. 193.

performed in the following year at a cost within four per cent of the amount of the estimate. In holding that the claimed deduction *was* not allowable, the Circuit Court said:

The liability for the estimated deduction clearly had not accrued during the year in which deduction was sought. The only thing which had accrued was *the obligation to do the work* which might result in the estimated indebtedness after the work was performed.

It is well settled that deductions may only be taken for the year in which the taxpayer's liability to pay becomes definite and certain, even though the transactions (such as the contract in the present case) which occasioned the liability, may have taken place in an earlier year. * * * Here liability for the work done after July 1, 1938 had not been incurred *for the work had not been performed.* [Emphasis added.]

Similarly, in *Amalgamated Housing Corporation*, 37 B. T. A. 817, aff'd. per curiam, 108 F. 2d 1010, it was held that deductions for reserves for the anticipated cost of renovating apartments were not allowable. In that case the operations of the taxpayers were supervised by a state agency, and it was required to renovate its apartments periodically, and to set aside a reserve for that purpose out of rents received. It knew what its costs would be, as it had a contract for the repainting of the rooms at a fixed amount. We said in part:

Although the petitioners were obligated to renovate, they had no liability to pay anyone anything until someone had performed some services. The accrual is for services in renovating, not of the duty to renovate. The accrual method does not permit the anticipation of future expenses prior to the rendition of the services for which the payment is due.

In *Atlas Mixed Mortar Co.*, 23 B. T. A. 245, the taxpayer was required by city ordinance to refill a pit from which it excavated sand and gravel, and it was required to file a performance bond. In the years that were before us, the taxpayer did not do any refilling. It set up reserves for the estimated cost of refilling and claimed deductions therefor. In holding that the claimed deductions were not allowable we quoted from an earlier case (*William J. Ostheimer*, 1 B. T. A. 18) that the liability for restoration of property "at some indefinite or indeterminate time in the future is not a present actual liability, and is not the actual incurring of an expense or liability."

In this group of cases, something further remained to be done before any liability to pay any amount had been incurred by the taxpayer.[8] Consequently in those cases, as here, the liability in the taxable year was contingent and not accruable as a deduction. *Brown* v. *Helvering, supra.*

To support the deductions here claimed the petitioners rely heavily on the case of *Harrold* v. *Commissioner*, 192 F. 2d 1002, which re-

[8] In the *Atlas Mixed Mortar* case, *supra,* the backfilling of the excavation was done by others at no cost to the taxpayer.

versed the decision of this Court in the case of *Paul Harrold*, 16 T. C. 134. That case, in its general aspects, resembles those before us. There the taxpayers were members of a partnership that was engaged in strip-mining operations under leases on lands in West Virginia. Under state law and the leases the partnership was required to backfill mined areas, and it posted a performance bond to insure compliance with its statutory obligations. By the end of 1945 operations had been completed on a tract of 31.09 acres. One of the partners had been engaged in strip-mining and backfilling for 16 years. Based on his experience, the partnership estimated the cost of backfilling at $1,000 per acre. It accrued $31,090 on its books as a reserve for backfilling and deducted that amount on its 1945 return. In 1945 the partnership was using its equipment in stripping operations and it postponed backfilling until 1946. Backfilling operations were commenced in the spring of 1946 when the weather became favorable, and were completed in that year at a cost of $25,210.18. The partnership then reduced the estimated cost shown on its books, and filed an amended return for 1945 in which it reduced the claimed deduction to the amount of the actual cost of backfilling.

The Circuit Court held in the *Harrold* case that a deduction was allowable to the extent of the $25,210.18 expended in 1946 in backfilling. It cited and discussed the cases that we have mentioned above, and others, and expressed agreement with the general rule as to the need for the existence of a fixed liability and the certainty of the amount of the liability.[9] The Circuit Court stated its conclusion as follows:

> We conclude that when all the facts have occurred which determine that the taxpayer has incurred a liability in the tax year, and neither the fact nor the amount of the liability is contested, and the amount, although not definitely ascertained, is susceptible of estimate with reasonable accuracy in the tax year, deduction thereof from income may be taken by a taxpayer on an accrual basis. This procedure does not violate the principle that income taxes must be calculated on an annual basis, but, on the contrary, allocates to each year the proper income and expense, and prevents distortion of the taxpayer's

---

[9] After expressing agreement with the general rule as to accruals, the Circuit Court quoted from the case of *Lucas* v. *American Code Co., supra,* on the point of what the Supreme Court there referred to as an exception to the general rule in the following language:

> Exception is made, however, in the case of losses which are so reasonably certain in fact and ascertainable in amount as to justify their deduction, in certain circumstances, before they are absolutely realized.

In the *American Code Co.* case, the Supreme Court further said:

> In the few cases in which the Board of Tax Appeals has allowed a deduction in the year of the breach, the contracts, involving the purchase and sale of goods, were performable in a comparatively short period; the approximate amount of the damages was reasonably predictable; negotiations for settlement had been commenced within the year and were completed soon after its close; and the taxpayers had accrued on their books, at the end of the year, a liability reasonably estimated to equal the amount of the damages.

financial condition in the tax year. * * * We think the proper approach to the problem before us should be realistic and one that accords with good business practice, rather than an approach based upon subtle technicalities.

We need not express any view here as to whether or not we agree with the holding of the Circuit Court on the facts before it in the *Harrold* case. Whether the decision in that case be regarded as founded on the general rules concerning accruals, or on the exceptions thereto, there are factual reasons which require us to hold that the conclusion reached by the Circuit Court in that case is not decisive of those before us. As we understand the facts in the *Harrold* case, the obligation to backfill the mined area was initially and continuously the obligation of the partnership. In these proceedings, the partnership engaged contractors to do the stripping, and such contractors agreed to and did backfilling on at least some of the leased tracts. The evidence is that the stripping contractors backfilled on three of the tracts. There is no evidence at all as to whether the contractors agreed to, or did, any backfilling on the other tracts, except the Allison Farms as to which the evidence is only that the contractor did not backfill. In view of such assumption of liability by contractors, the extent of which is not clearly shown by the record, it cannot be said that in the taxable years the partnership had incurred a fixed obligation to pay the cost of backfilling the several tracts that were mined.

In the *Harrold* case, the partnership proceeded with dispatch to fulfill its obligation by starting backfilling in the spring of 1946 and completing the operation in that year. In these cases, backfilling had not been completed on three of the tracts at the time of the hearing near the end of 1951. On the Allison Farms tract, the mining was started in 1946 and completed in 1947. On that tract, only 10 acres had been backfilled out of a total of 28.6 acres that were strip-mined. Apparently, the partnership did not regard the provisions of Pennsylvania law as imposing an obligation dischargeable at any ascertainable time despite the statutory requirements for backfill in the exposed face of the unmined coal within one year after completion of operations and the planting of the mined area within three years after completion. P. S. secs. 1396.10, 1396.11.

The reasonableness of estimates may be tested in the light of actual experience. *Henry Hudson*, 39 B. T. A. 1075, 1096.[10] Tested by this measuring stick, the evidence does not establish that the reserves set up represented a reasonable estimate of the cost of backfilling. On the Allison Farms tract, backfilling had been completed on 10 acres

---

[10] Quoting *Sinclair Refining Co.* v. *Jenkins Petroleum Process Co.*, 289 U. S. 689, involving a patent valuation question where the Court said :
   Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within.

at the time of the hearing. The total area stripped comprised 28.6 acres. Assuming a uniform cost per acre, the total cost of backfilling would be some $72,600 as compared with the reserves of $31,941 and the amount of $46,251 now claimed. On the Houston, Willison, and Boon Terrace tracts, the backfilling had been completed at the time of the hearing. The record does not show any amounts incurred or expended in backfilling those tracts from which over 16,000 tons of coal were mined. Again, over 81,000 tons were mined from the Feist and Thompson tracts, and according to the stipulated facts only $2,359.72 was expended in backfilling which was at the rate of slightly under three cents per ton. These facts cast grave doubt on the reasonableness of the estimates on which the reserves were based, and on the partnership's ability to estimate in the taxable years with reasonable accuracy the cost of backfilling the mined areas.[11]

In summary, the petitioners have not established that under the general rules of accrual accounting there had occurred in the taxable years events which fixed the amount and the fact of the partnership's liability to pay for backfilling the areas that were strip-mined within those years. Under those rules, the most that can be said in favor of the petitioners is that their partnership had incurred an obligation to do some work which is not sufficient to support a dollar and cents deduction in advance of performance. The facts do not bring these cases within that exception to the general rules where the cost is so reasonably certain in fact and ascertainable in amount, followed by prompt payment, as to justify deduction before actual realization.

We accordingly hold that the respondent did not err in disallowing claims for backfilling in excess of the amounts of actual expenditures therefor in the taxable years.

*Decisions will be entered under Rule 50.*

---

[11] On the matter of the amount allowable, these cases are distinguishable from the *Harrold* case on another point. The evidence in these cases is that where the backfilling was performed by stripping contractors, the cost thereof was added to contractor's cost for stripping. Presumably, such added cost was deducted by the partnership in computing the cost of coal sold and to that extent there would be a double deduction in allowing to the partnership a deduction for the full amount of the cost of backfilling. Double deductions are not allowable, absent statutory provision. *Ilfeld Co.* v. *Hernandez,* 292 U. S. 62.

On brief, the suggestion is made by the petitioners that as to the year 1948—which does not involve the Allison Farms tract—the amount of the reserve can be adjusted under our Rule 50 to reflect the work of backfilling performed by stripping contractors. The suggested procedure would have the effect of injecting an issue not raised by the pleadings. This is not permissible under the cited rule. *Bankers' Pocahontas Coal Co.* v. *Burnet,* 287 U. S. 308.