J. E. Vincent, et al.,[1] Petitioners, *v.* Commissioner of Internal Revenue, Respondent.

Docket Nos. 27877, 27878, 27879, 27880, 30435. Promulgated December 24, 1952.

[1] Proceedings of the following petitioners are consolidated herewith: J. E. Vincent, Docket No. 27878; J. E. Vincent Company, Inc., Docket No. 27879; Gregory Run Coal Company, Docket No. 27880; and J. E. Vincent Company, Inc., Docket No. 30435.

*Sidney B. Gambill, Esq.*, for the petitioners.
*George C. Lea, Esq.*, for the respondent.

508

510

512

516

518

OPINION.

ARUNDELL, *Judge:* The parties have settled by stipulation issues which involved comparatively small amounts and which concerned deductions for traveling expenses and the cost of small tools. An error alleged as to amortization of leaseholds in Docket No. 27880 was withdrawn by the petitioner.

The remaining issues will be considered in the order in which they are presented by the parties in their briefs.

### *Deductions for Reserves for Backfilling.*

In its returns for 1945 and 1946, Gregory Run Coal Company deducted as items representing a part of the cost of sales, the respective sums of $14,352.12 and $22,354.30 which were designated "Cost of Back Fill." The respondent restored those amounts to income in his determination of the deficiencies, and his action in that respect is assigned as error by Gregory Run Coal Company in Docket No. 27880.

The claimed deductions have their origin in statutes of West Virginia concerning strip-mining, and leases under which J. E. Vincent was granted the right to strip-mine coal on several tracts in the Eagle and Sardis Districts of Harrison County, West Virginia.

The statutes of West Virginia [4] make it unlawful for anyone to engage in the strip-mining of coal without obtaining a permit from the Department of Mines. They require the payment of a registration fee and the posting of a penal bond of $500 per acre conditioned on faithful performance of the requirements with respect to backfilling. They impose on the operator the duties, among others, of covering the face of the coal on mined areas, regarding the overburden removed in a manner approved by the Department of Mines and agricultural experiment station, and to fertilize and plant trees, shrubs, grasses, or vines on the lands affected in accordance with regulations of the Department of Mines and agricultural experiment station. If an operator fails to comply with the provisions of the statute, his permit may be revoked and his bond forfeited.

Vincent's leases required him to comply with state law and regulations as to backfilling and regrading, and some required restoration of the original contour of the land. By the acceptance by Gregory Run Coal Company of Vincent's assignment of his leases, that company assumed the performance of all of his obligations.

The amounts claimed as deductions by Gregory Run Coal Company do not represent expenditures for backfilling. They are estimates of such cost computed at the rate of 10 cents per ton of coal mined. It was stipulated by the parties that at the time of the hearing of these

---

[4] West Virginia Code, Mining Laws, chapter 22, article 2A.

proceedings no backfilling had been done by or on behalf of the Gregory Run Coal Company.

We conclude that the respondent properly disallowed the claimed deductions for the estimated costs of backfilling. The basic facts in these proceedings are not distinguishable from those in the case of *Ralph L. Patsch*, 19 T. C. 189. In both cases the lessees were obligated by the terms of their leases and by state law to backfill areas that had been strip-mined. In both, the obligation had been assumed by others, at least partially. In both, backfilling had not been completed several years after mining operations had been completed, despite time limitations imposed by state law. In the *Patsch* case, we pointed out that the obligation that is necessary to support an accrued deduction is an obligation to pay. An obligation to perform services at some indefinite time in the future will not justify the current deduction of a dollar amount as an accrual. See cases cited and discussed in the *Patsch* case, *supra*.

The petitioner, Gregory Run Coal Company, relies on the case of *Harrold* v. *Commissioner*, 192 F. 2d 1002, to support its claim for allowance of the deductions. The decision of the Circuit Court of Appeals in that case rests on facts that are different from those before us. There the mine operator made an estimate at the end of the year in which operations were completed, the amount of which was based on a number of years of experience of one of the mining partners. The backfilling was actually started as early in the following year as weather conditions would permit, and was completed within that year. The amount claimed as a deduction was limited to the amount actually expended for backfilling, although a larger estimated amount had been claimed in the return that was filed for the year prior to that in which the backfilling was done. The Circuit Court, in allowing the deduction, called attention to cases cited by the Supreme Court in *Lucas* v. *American Code Co.*, 280 U. S. 445, where although liability to pay an ascertained amount had not been incurred with unalterable finality, nevertheless there was an imminent, recognized liability to pay a sum susceptible of reasonable ascertainment as to amount, and payment was actually made shortly thereafter. Cases of this kind were recognized by the Supreme Court in the *American Code Co.* case as constituting an exception to the general rule under which deductions for expenses, taxes, and similar items are allowed under the accrual method only where the facts establish the existence of a definite liability to pay an established or ascertainable amount. The Circuit Court in the *Harrold* case apparently found that the facts before it were sufficient to bring the case within the exception recognized in the *American Code Co.* case. In these proceedings, we are unable to find facts sufficient to say that in the years 1945 and 1946 Gregory Run

Coal Company had incurred a definite liability to pay a fixed or reasonably ascertainable amount for the backfilling of the mined areas. These proceedings come within the purview of the case of *Ralph L. Patsch, supra,* and cases cited therein, principally *Brown* v. *Helvering,* 291 U. S. 193; *Spencer, White & Prentis* v. *Commissioner,* 144 F. 2d 45; *Amalgamated Housing Corporation,* 37 B. T. A. 817; and *Atlas Mixed Mortar Co.,* 23 B. T. A. 245.

There is present here, as in the *Patsch* case, the element of assumption of liability by others. As shown by the findings, Summit Fuel Company, as a part of its mining operations, undertook to backfill the mined areas. True, any backfilling performed by it was to be at the expense of Gregory. But Gregory's liability under that agreement was only one of reimbursement to Summit if and when Summit backfilled. This is far from fixing on Gregory in the taxable years a definite liability to pay a fixed or ascertainable amount. Further, in 1947, Coal Service Corporation came into the picture and relieved Gregory Run of its liability to backfill.

Accordingly, the issue as to deductions by Gregory Run Coal Company for estimates of cost of backfilling is decided for the respondent.

*Gregory Run Coal Company—Deductions for Overriding Royalties to J. E. Vincent; and for Tipple Rental to J. B. Williamson.*

The issue here is whether Gregory Run Coal Company may deduct, as royalties and rentals, the gross sum of $57,449.66, which was paid to Vincent in March 1946, and which in turn he divided with Williamson.

It is the undisputed testimony of Vincent that at the time Gregory Run Coal Company was organized it was understood that he was to receive an overriding royalty of 20 cents per ton for each ton of coal mined, and that Williamson was to receive an equal amount for each ton that went over his tipple, cleaning plant and siding. Vincent's agreement with Gregory Run Coal Company stated that he was to receive 40 cents per ton of coal mined. Thereafter, on July 9, 1945, Vincent executed a declaration of trust whereby he declared himself to be a trustee for Williamson to the extent of one-half of the proceeds from the 40 cents royalty to be received from the leases that he assigned to Gregory Run Coal Company.

Royalties, on the accrual method, under the assignment by Vincent, amounted to $57,449.66 which the respondent disallowed as a deduction to Gregory Run Coal Company. The respondent's position, in brief, is that said amount did not represent bona fide royalties and rentals but instead amounted to a division of profits between Vincent and Williamson.

We think that the respondent erred in his disallowance of the claimed deduction. It may be that under other circumstances Gregory Run would not have paid an overriding royalty of 20 cents per ton, nor 20 cents per ton for the rental of a tipple. But we must take the facts as we find them and we do not find therein any evidence to establish a lack of bona fides. Vincent had leases that he was required to operate in order to retain them. At his own expense he had uncovered a large block of merchantable coal. He was entitled to some consideration for that work which added to the value of Gregory Run's holdings. The respondent points to the royalties payable to Vincent's lessors as an indication that a 20 cent overriding royalty was not within reason. The most substantial of the leases had been entered into prior to the completion of Vincent's exploratory work. The others in the Eagle and Sardis districts appear to have been fill-in leases made to round out the Dawson lease which was the major one. Royalties under other leases made in the year 1945 in the same county ranged from 25 cents to 49 cents per ton for mineral and surface rights.

Williamson's tipple was available for use by Gregory Run Coal Company, and the evidence is that there was only one other that could have been used and its use would have cost much more than the 20 cents per ton charged by Williamson. There is some evidence that one other tipple, a smaller one, had been rented at the rate of 5 cents per ton, but the owner soon found that that rate was too low and canceled the rental agreement. Gregory Run Coal Company used Williamson's tipple and paid for such use at the rate of 20 cents per ton of coal loaded over it. We are satisfied that that was a reasonable rental, and the amount paid was an ordinary and necessary business expense.

*Exclusion from the Statutory Definition of "Gross Income from the Property" of Amounts Paid to Summit Fuel Company.*

The findings of fact that we have made show that for the period ended December 31, 1945, Gregory Run Coal Company paid the sum of $222,617.43 to Summit Fuel Company for the strip-mining of coal from the Dawson and related leases. For the calendar year 1946, amounts aggregating $275,372.82 were either paid or properly accrued. There is some discussion, and some evidence, on the point of whether all of the amount paid for 1946 was for strip-mining or whether some part of it was paid for only hauling. These matters are beside the point for decision.

The starting point for the computation of the amount allowable for depletion of coal mines is "the gross income from the property during the taxable year * * *." Internal Revenue Code, section 114 (b) (4) (A). In applying that term to oil and gas properties, it has

been said that it means "gross income from oil and gas  *  *  *  and the term should be taken in its natural sense." *Helvering* v. *Mountain Producers Corporation*, 303 U. S. 376. Section 29.23 (m)–1 (f) of Regulations 111, Supplement, provides in part as follows:

> In the case of a crude mineral product other than oil and gas, "gross income from the property" * * * means the gross income from mining. * * *
>
> If the taxpayer sells the crude mineral product of the property in the immediate vicinity of the mine, "gross income from the property" means the amount for which such product was sold, * * *.

We think that in determining Gregory Run's gross income from the Eagle and Sardis district properties, the respondent erred in excluding the amounts that were paid to Summit Fuel Company. The contract between Gregory Run and Summit Fuel contained the following provision:

> Gregory shall market said coal through such selling agent as it may select.

The respondent does not contend that Gregory Run did not sell the coal that was produced in the years 1945 and 1946. His argument, summarized, is that Summit Fuel Company had an economic interest in the coal which entitles it to deductions for depletion. This argument is based in part on statements in the contract between Gregory Run and Summit Fuel wherein the parties refer to "each joint adventurer," and that they have contributed to the "joint enterprise." These expressions are not conclusive of the intent of the parties judged by the provisions of the contract as a whole. As we have shown, the contract provided that Gregory Run was to sell the coal. It was also provided that all money arising from the sale of the coal was to be paid to Gregory Run. Summit's only interest was to receive $1.55 per net ton for coal that it mined, transported, and loaded. The wording on this point is carefully spelled out. It is:

> * * * for its participation in this joint adventure Summit shall receive one and 55/100 dollars ($1.55) per net ton for all coal mined, transported and loaded by it * * *.

In *Morrisdale Coal Mining Co.*, 19 T. C. 208, we held that the respondent erred in excluding from a mining lessee's income from coal properties the amounts that it paid to strippers under several contracts. The contracts there under consideration were generally similar to that between Gregory Run and Summit Fuel in that under them the stripping contractor was engaged to strip-mine coal from designated tracts, and to haul and load it into railroad cars at specified points. For such services, the stripping contractors were to receive a specified amount per net ton of coal strip-mined and loaded into railroad cars. There were minor points of distinction between the several contracts in that case, such as the facts that gave rise to a right of termination, the amount of overburden required to be removed, and

the right of the employing operator to designate points of mining and loading.

Upon examination of the several stripping contracts in the *Morrisdale Coal* case, *supra*, we concluded that none of them granted to the stripping contractors an economic interest in the coal in place, and for that reason no apportionment of the gross income from the property was to be made between the employing contractor and the stripping contractor. In that case, analyzing two of the stripping contracts, we said in part:

Most of the cases in which depletion has been allowed to an independent contractor have involved situations where the producer or miner of the mineral or other depletable asset has received payment either in kind or as a percentage of the ultimate selling price or profit derived from the sale of the commodity. *Spalding* v. *United States* (C. A. 9, 1938), 97 F. 2d 697, certiorari denied 305 U. S. 644 (1938) ; cf. *Edward J. Hudson*, 11 T. C. 1042 (1948), affd. (C. A. 5, 1950) 183 F. 2d 180.

Neither of such situations is present in the instant case. The independent contractors received a stated amount per ton for coal of good merchantable quality satisfactory to petitioner. The amount they were to receive per ton was not dependent upon the market nor upon the price petitioner received upon the sale of such coal. Payment was made at stated intervals provided in the contract and was entirely independent of whether or when petitioner sold the coal. The contractors assumed no risk as to the market price, they received no payment in coal, and they had no right to sell any coal to other parties.

The factors mentioned in the above quotation exist in this case. Summit Fuel was not to receive payment in kind or as a percentage of the selling price or profit; it was to receive a stated price per ton of coal; payment was to be made at stated intervals and was independent of whether or when Gregory Run sold the coal.

The case of *James Ruston*, 19 T. C. 284, is distinguishable on the facts. In the *Ruston* case, the lessee of coal property contracted with a strip-mining contractor for the mining, loading, and shipping of the coal. The contractor was granted the sole and exclusive right to use and occupy the leaseholds; the lessee agreed not to engage in any stripping operations on the leaseholds, and not to grant any mining rights to others during the term of the contract. The contractor was to furnish at its cost and expense all materials, tools, machinery, equipment, and labor, to build all necessary roads, to make all necessary improvements incident to its operations, and to maintain and keep in proper repair and working order the tipple, screens, loading ramps, sidings, etc., on the property, and to screen, produce, load, clean, and ship the coal at its own expense. The contractor was also required to carry fire insurance on some of the lessee's property, workmen's compensation on its own employees, and public liability and property damage insurance on the operations. The lessee had the right to sell the coal, but it was provided that the interest of

the contractor "in coal produced and shipped shall be 83 per cent of the net selling price" of the coal as received by the lessee, less a selling commission of 15 cents per ton to be deducted from the gross selling price. In actual practice, the selling agent forwarded directly to the stripping contractor its 83 per cent share of the net sales price.

On the facts in the *Ruston* case, outlined above, we concluded that by the contract between the parties the lessee transferred to the stripping contractor an economic interest in the coal in place which entitled the stripper to percentage depletion on its gross income from the severance and sale of coal. The rights, duties and liabilities of Summit Fuel Company were so far different from those in the *Ruston* case as to require a different conclusion as to the relation of the stripper with the lessee of the coal lands. We think the relation of Gregory Run Coal Company and Summit Fuel Company was simply that of employer and employee, which gave the employee no more than an economic advantage derived from production rather than an economic interest in the coal.

We conclude that the contract between Gregory Run Coal Company and Summit Fuel Company did not give to Summit Fuel any economic interest in the coal in place. Accordingly, the amounts paid to it by Gregory Run should not be excluded from the latter's gross income from the property.

*Inclusion in J. E. Vincent's Income of the Amount of the Note for $10,000 Executed by Gregory Run Coal Company, Dated June 12, 1945; Depletion Deduction.*

As a part of the deal that was consummated in June 1945, between Vincent and Williamson, Gregory Run Coal Company issued its note to Vincent in the amount of $10,000. The note was negotiable and interest bearing. The company paid the note in February 1946.

The petitioner's resistance to inclusion of the face amount of the note in income for 1945 is based primarily on his contention that it had no fair market value at the time he received it. The argument is that Gregory Run Coal Company was engaged in a hazardous business; only $1,000 had been paid as capital; its equipment was mortgaged to secure the purchase price, and the payment of Vincent's note was subordinate to the payment of the equipment notes. Both parties make some argument as to the effect of an agreement dated July 9, 1945, between Vincent and Gregory Run Coal Company wherein was set forth the order in which Gregory Run would discharge its obligations. Whatever the effect of that agreement as to Gregory's several creditors thereafter, it is not decisive of the question of the fair market value of Vincent's note at the time he received it on June 12, 1945.

The respondent has included the face amount of the note in income. That action is presumptively correct. The evidence does not establish to our satisfaction that the note had any lesser value. Simultaneously with the issuance of the note, Gregory acquired Vincent's coal leases which presumably both Vincent and Williamson thought were valuable. On one of them a large block of merchantable coal had been uncovered by Vincent. The company had available machinery to do the mining, and it had an agreement for the sale of coal.

We find no error in including the sum of $10,000 in Vincent's income for 1945.

The petitioner Vincent contends that if the $10,000 note was income for 1945, then he is entitled to a depletion deduction of 5 per cent thereof. His theory is that the amount of the note was a cash bonus in the nature of an advance royalty. He cites *Murphy Oil Co.* v. *Burnet*, 287 U. S. 299; *Palmer* v. *Bender*, 287 U. S. 551; *Sunray Oil Co.*, 3 T. C. 251, affd., 147 F. 2d 962. The respondent's position is that the note was part of the consideration paid for the transfer of the leases, and that such payments are not subject to deductions for depletion. He cites *Helvering* v. *Elbe Oil Land Development Co.*, 303 U. S. 372; *Anderson* v. *Helvering*, 310 U. S. 404.

We hold that the petitioner is not entitled to the claimed deduction for depletion. The transaction between Vincent and Gregory Run Coal Company was a sale by Vincent of his leases and his marketing agreement. His right to receive payment of the note·did not give him an economic interest in the coal in place. The note was secured by a deed of trust upon the properties that he conveyed, and its payment was not made dependent on production of coal. Receipts from sales of mineral properties, not dependent on production, are not subject to deductions for depletion. *Anderson* v. *Helvering, supra;* Mertens, Law of Federal Income Taxation, Vol. 4, section 24.23.

*Income from Lambert's Run Property, Period May 1, 1947 to December 31, 1947 (Case of J. E. Vincent, Dkt. No. 27878).*

The question for decision under this issue is who is to be taxed on the amount of $808,064.46 that Vincent turned over to J. E. Vincent, Inc., between May 1, 1947 and December 31, 1947. The respondent disallowed that amount as a deduction to Vincent and thereby treated it as his income. The corporation included in its income the amount in dispute, and its reported income has not been reduced on account thereof by the respondent.

The $808,064.46 is, of course, income either to Vincent or Vincent, Inc., but not to both. Both are before us in these proceedings and the issues are so framed as to require us to make the decision.

J. E. Vincent, as an individual, had acquired leases on the Lambert's Run property. He had also, as an individual, negotiated contracts

for the stripping of the coal with the two Swaney companies, and for the sale of the coal with the Weaver Company. Vincent wanted to assign the Lambert's Run lease to his controlled corporation but the Dawson Company, the principal lessor, would not consent to the assignment. Vincent so reported to his corporation. Thereupon it became necessary to work out a different arrangement. This was done by the adoption of a resolution by the directors of Vincent, Inc., and the simultaneous execution of an agreement between Vincent and Vincent, Inc. The resolution recited that the corporation would operate the coal properties without assignment of the leases. However, the agreement between Vincent and the corporation, simultaneously entered into, was entirely different. Under the agreement, Vincent, and not the corporation, was to continue to operate the strip-mines in his own name and he was to be regarded as the operator of the coal. It further provided that he was to receive payment from his sales agent for all coal that he had under lease, and that out of the proceeds of such sales he was to pay brokerage, royalties for coal, surface rights, rights of way, rental on sidetrack property and buildings, and other similar royalties, and state taxes on mining operations. The remainder of the sales proceeds, which was described in the contract as "net proceeds" was to be paid over by Vincent to Vincent, Inc., and was so paid in 1947.

Under neither the resolution nor the agreement did Vincent purport to convey to Vincent, Inc., any rights or obligations incidental to the Dawson lease. The Thrasher lease, which granted surface rights, was not mentioned. Neither the stripping contracts nor the contract for the sale of coal were assigned. Apparently Vincent and his corporation decided that if they could not effect a transfer of the underlying Dawson lease, there would be no point in transferring incidental rights and obligations.

The net result of the arrangement between Vincent and Vincent, Inc., was that Vincent paid over to the corporation income earned by him as an operator of coal properties and as an owner of coal leases and other properties in connection therewith. This does not relieve him of tax liability on such income. *Lucas* v. *Earl*, 281 U. S. 111; *Helvering* v. *Horst*, 311 U. S. 112; *Harrison* v. *Schaffner*, 312 U. S. 579.

Even if the agreement between Vincent and Vincent, Inc., can be regarded as vesting in the latter a property right of some kind, nevertheless Vincent's retention of the Dawson lease in his own name, and the retention of other rights and obligations would require the taxation of the income to him. Among the rights that he had was the right of cancelation of the contract on 30 days' notice. Through this he could control the flow of income. Under these facts, the income must be regarded as his. *Commissioner* v. *Sunnen*, 333 U. S. 591.

We conclude that the respondent properly included in Vincent's income for 1947 the income that he received in that year from operation of the Lambert's Run property and that he paid over to Vincent, Inc.

As Vincent reported income on the cash basis, the amount of $146,-823.40 which he collected in January 1948 on account of sales made in December 1947 and paid over to Vincent, Inc., in January 1948 should be included in his income for the year 1948 and excluded from the income of Vincent, Inc., for 1947. There is no dispute between the parties as to amounts to be allowed as expenses in connection with the earning of the above amounts of income from the Lambert's Run property.

*Depletion; Gross Income from the Property; Exclusion of Amounts Paid to Strippers (Case of J. E. Vincent for 1947, Vincent, Inc., for Year Ended April 30, 1948 and Period Ended Jan. 3, 1949).*

In computing the amounts allowable for depletion in the cases of J. E. Vincent for the year 1947, and of J. E. Vincent Company, Inc., for the year ended April 30, 1948, and the period ended January 3, 1949, the respondent excluded from gross income from the coal properties the amounts paid to the contract strippers, Swaney Contracting Company and B. H. Swaney and Sons, Inc. Such exclusions are assigned as errors by the petitioners.

We have discussed a similar issue as to amounts paid by Gregory Run Coal Company to Summit Fuel Company for stripping coal from other leased properties. Under the contracts with the Swaney companies, as under the Summit Fuel contract, the important feature was that the stripping contractors were employed by the operator to strip-mine coal and haul it to the loading point at a price per ton to be paid by the operator. In Vincent's contracts with the Swaney companies, there were provisions for reduction or increase of the basic price per ton to be paid to the strippers if the current zone market of the price of coal was reduced below or increased above specified amounts per ton. They also contained a provision for cancellation by Vincent if the market price was reduced below a stated figure and if the parties failed to renegotiate the contracts. None of these provisions gave the stripping contractors an economic interest in the coal in place. The sliding price merely provided for adjustment of the price per ton to be paid to the strippers upon the coal that they mined and hauled. The Swaney companies were not dependent on the sale of coal by Vincent for their compensation, as both contracts provided that the failure of the sales agent to pay Vincent should not relieve Vincent of his obligation to pay the Swaneys the price agreed upon at the times and on the basis provided in the agreements. The

contracts here were more like those involved in the *Morrisdale Coal Co.* case, *supra*, than those in *James Ruston*, *supra*. For reasons given above under the issue as to payments by Gregory Run Coal Company to Summit Fuel Company, we hold that this issue is governed by our decision in the *Morrisdale Coal* case, and that the amounts paid to the stripping contractors should not be excluded from the gross income from the property in computing depletion deductions allowable to J. E. Vincent and J. E. Vincent Company, Inc.

*Depreciation Deductions in re Erie Tipple, Scales and Siding (Case of Vincent, Inc., for Year Ended April 30, 1948, and Period Ended Jan. 3, 1949).*

In determining the deficiencies in the case of J. E. Vincent Company, Inc., for the fiscal year ended June 30, 1948, and the period ended January 3, 1949, the respondent disallowed portions of the depreciation deductions claimed with respect to the company's Erie tipple, scales and railroad siding. In reducing the depreciation deductions claimed, the respondent explained in the notices of deficiency that the basis for the properties in the hands of Vincent, Inc., was the same as in the hands of its transferor, namely, $44,488.03.

The petitioner does not object to the respondent's determination that the salvage value of the properties was $20,000, and that the basis was recoverable over a 20-month period. The only issue is the basis.

The tipple and appurtenant properties were acquired by Vincent, Inc., on January 2, 1948, from its controlling stockholder, J. E. Vincent, at a price of $125,000 for which amount it gave its check. That amount, on the face of things, was the cost to the petitioner and, in the absence of any recognized exception or unusual circumstance, would be the basis for depreciation. Code section 113 (a) ; *Majestic Securities Corporation*, 42 B. T. A. 698, affd. 120 F. 2d 12. The petitioner maintains that the amount paid in this case was the basis. However, it apparently recognizes that transactions between corporations and controlling stockholders may be open to question, *Majestic Securities Corporation*, *supra*, and has introduced evidence directed toward establishing that the fair market value of the properties was not less than $125,000 at the time of the purchase. That was the testimony of several witnesses who were familiar with the properties and had at least some knowledge of costs of construction and values of tipples and the customary appurtenant properties.

The respondent says that the sale of the properties by Vincent to his controlled corporation was not a bona fide transaction and would not give the corporation a basis of the amount that it paid. He points to Vincent's treatment of the properties in his returns for 1946 and 1947 wherein he reported costs of the properties at $54,000 and some $61,000,

respectively, and claimed depreciation at rates of 33⅓ per cent on the theory that available coal would be exhausted within three years. We think that those matters are of little importance, particularly in view of the evidence which shows that actual cost to Vincent was in excess of $78,000 and that the ownership and operation of the properties were beneficial to the purchaser in the conduct of its business. Also, the petitioner Vincent, in his 1948 return, reported a gain of over $88,000 on the sale of the properties.

We conclude that the basis of the properties in the hands of J. E. Vincent Company, Inc., was $125,000 and that depreciation deductions should be computed and allowed on that basis.

The parties have stipulated figures to be used in computing allowable depletion deductions in the cases of J. E. Vincent, Docket No. 27878, J. E. Vincent Company, Inc., Docket No. 27879, and Gregory Run Coal Company, Docket No. 27880, after our decision of other issues. Effect will be given thereto in the recomputations.

*Decisions will be entered under Rule 50.*