DENISE COAL COMPANY, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 56762, 56763, 56764. Filed December 24, 1957.

---

[1] The following proceedings are consolidated herewith: Estate of Charles J. Margiotti, Deceased, Denise Z. Margiotti, Executrix, Docket No. 56763; Juliette C. Suto (formerly Juliette C. Margiotti), Docket No. 56764.

*Alexander L. Suto, Esq.*, and *Samuel L. Goldstein, Esq.*, for the petitioners.

*George J. Rabil, Esq.*, for the respondent.

536

538

544

OPINION.

BLACK, *Judge:* The issues involved herein will be discussed in the same order as the findings of fact relating to them.

## *Issue 1. Economic Interest.*

Denise owned or leased certain coal lands. It entered into contracts with various stripping contractors to mine the coal. It sold the coal which was mined by the strippers and, for the purpose of computing its percentage depletion deduction under sections 23 (m) and 114, I. R. C. 1939,[4] it treated the gross proceeds from the sale of coal, less the amount that it paid as royalties to lessors, as its gross income from the property. The respondent determined that it must also deduct the amounts paid to the contract strippers in computing its gross income from the property.

Whether the amounts paid to the contract strippers must be deducted in computing Denise's gross income from the property depends upon whether the contract strippers had an "economic interest" in the property. The determination of this question is dependent upon the facts and, in particular, upon the contract and arrangements between the parties.

The various contracts between Denise and the stripping contractors were substantially similar. They provided that the strippers would strip the overburden and remove, prepare, clean, remove the bone, and load the coal so that it would be marketable. Denise had the right to inspect and reject any coal at the pit. Some of the contracts required the strippers to haul the coal in the strippers' trucks from the pit to the tipple and to load it on the railroad cars; other contracts required the coal to be hauled in the strippers' trucks to the tipple, while one contract required only that the coal be loaded on Denise's trucks at the pit. All coal leaving the pit was required to be paid for. Denise was to pay a certain price per ton but all the contracts provided that if the selling price of the coal was increased both Denise and the stripper would share in the increase. If the selling price decreased, the price to be paid the stripper was to be mutually agreed upon. Some of the contracts provided that if Denise failed to sell all of the coal produced by the stripper, the stripper could sell the coal and remit to Denise any amount in excess of the contract price. Some of the contracts provided for payment by Denise on certain dates for all coal mined and sold during prior periods, while others provided for payment for all coal mined and delivered during certain prior periods.

None of the contracts gave the stripper the exclusive right to mine the subject property. Denise was to designate the areas to be stripped but the strippers were permitted to strip in an orderly and continuous manner. The stripper was to remove and deliver at least the designated quantity per month and Denise agreed that if the

---

[4] All section references are to the Internal Revenue Code of 1939, as amended.

properties it designated were not sufficient to produce that quantity it would provide other similar properties.

Denise built the tipple and main roads, explored the properties, guarded the properties, paid the real estate taxes, and provided the bonds for the rehabilitation of the properties. The strippers used their own machinery for stripping and built roads for access to the pits and other facilities necessary for conducting their operations. Under some of the contracts the strippers manned and supplied the power for the tipple.

The contracts were automatically renewable on a yearly basis unless either party desired to terminate. Denise could cancel on 10 days' notice if it could not sell the coal at a 10 per cent profit or if the stripper failed to remove the quantity of coal called for. The stripper could cancel if it could not realize a 10 per cent profit or because of Denise's default in payment.

We agree with respondent that the contracts gave the strippers an economic interest. The inescapable conclusion gleaned from a reading of the contracts is that the parties were engaged in a type of joint venture. The stripper's compensation was fixed but he was to share in any fluctuation in the market price. See *Virginia B. Coal Co.*, 25 T. C. 899 (1956). Each party had an investment in equipment and each party built or maintained a part of the necessary facilities. Although there was no express provision giving the stripper the exclusive right to mine any tract until exhaustion, neither party could cancel the contract without cause. However, a cancelable cause was the failure of either party to earn a profit of 10 per cent. These factors, we think, are clear indications that both Denise and the strippers were interested in the production of coal and that both looked to the severance and sale of the coal for their compensation. Cf. *Virginia B. Coal Co., supra*.

Petitioner insists that the phrase in the contracts "all coal leaving the pit must be paid for" renders the strippers mere hirelings who looked only to Denise for their compensation. We disagree. That phrase, in context, apparently relates to the inspection and rejection of coal at the pits. Denise had the right to inspect and reject coal at the pits but not thereafter. Once it left the pits Denise had to pay for it. But both parties contemplated the sale of all coal mined. The fact that Denise showed no coal inventory on any of its returns indicates that all coal mined was sold. The view is reinforced by the fact that some of the contracts provided only for payment by Denise for all coal *mined and sold*.

Since the various strippers had an economic interest it follows that the amounts paid by Denise to the strippers must be deducted from its gross proceeds from the sale of coal in determining its gross

income from the property for purposes of computing percentage depletion. The respondent's determination regarding this issue is upheld.

*Issue 2. Future Restoration Expenses.*

Denise was required (as of June 1, 1945) by Pennsylvania law to restore stripped properties (i. e., backfill and plant trees, shrubs, and grass) within 1 year after the strip-mining operation was completed. Denise did not, during any of the taxable years involved, complete any, nor enter into any contract for the performance of, restoration work on any of the stripped properties. During each of the years, however, it estimated the future cost of restoring the properties stripped during the year. On its books it made entries charging an expense account, sometimes called "Provision for rehabilitation of land destroyed through stripping," and crediting an account shown as a liability, sometimes called "Reserve for property destroyed by stripping operations." The amounts charged to the former account were taken as deductions, viz, ordinary and necessary business expenses, on its returns for the respective years. Respondent disallowed these amounts in their entirety determining that no such amounts were "paid or accrued" or "paid or incurred" during the years in which the deductions were claimed.

We agree with the respondent. Section 23 (a) (1) (A) allows a deduction for ordinary and necessary business expenses "paid or incurred during the taxable year." Since Denise is an accrual basis taxpayer, the relevant question is whether the claimed expenses were *incurred* during the taxable year. Secs. 43 and 48 (c).

During the years in question no restoration work was actually performed; if there had been, the cost of such work could be treated as an expense incurred regardless of whether the payment for that work was actually due during the year. Cf. *United States* v. *Anderson,* 269 U. S. 422, 440–441 (1926). Also, no amount was owed to any third party for restoration work that had been, or was to be, performed; if there was, this amount, under certain circumstances, might be treated as an expense incurred. Cf. *Brown* v. *Helvering,* 291 U. S. 193, 200 (1934).

Here, nothing occurred which gave rise to an expense incurred. It is true that petitioner had an obligation to obey the Pennsylvania law; but the obligation did not give rise to an expense incurred, because the obligation was in futuro. The record shows that during the years involved compliance with the restoration provisions of the law was never immediately required. In fact, no restoration work was done until 1950, and it appears that Denise did not violate the law or forfeit its bonds by not commencing the restoration sooner.

It may well be prudent to create a book reserve for contingent liabilities or future expenses. See *Lucas* v. *American Code Co.*, 280 U. S. 445, 452 (1930). And correct corporate accounting may permit the concomitant charge to be made against income, rather than earned surplus, so as to match income against expenses considered necessary to earn it. "But the form * * * reflected by correct corporate accounting opens questions as to the proper application of a taxing statute; it does not close them." *Bazley* v. *Commissioner*, 331 U. S. 737, 741 (1947).

The petitioner relies heavily on *Harrold* v. *Commissioner*, (C. A. 4, 1951) 192 F. 2d 1002, where items similar to those here involved were allowed as a deduction on the ground that the amount was susceptible of estimate with reasonable accuracy.

The rationale of the *Harrold* case, *supra*, conflicts with our view of the relevant statutory provisions. However, even under that view the amounts in question here could not be allowed as deductions because there has been no showing to our satisfaction that the amounts estimated were reasonably accurate. *Patsch* v. *Commissioner*, (C. A. 3, 1953) 208 F. 2d 532; *Commissioner* v. *Gregory Run Coal Co.*, (C. A. 4, 1954) 212 F. 2d 52, 57–58. Denise computed the amounts at certain rates per ton of coal mined, viz, 7½ cents for 1945 and 1946, 37 cents for 1947,[5] and 15 cents for 1948. Also in 1948 it recomputed the period from June 1 to December 31, 1946, and the year 1947 at 15 cents per ton. The rates were computed by dividing the average yield per acre (estimated at 4,000 tons) into the average cost per acre. Denise's witnesses testified as to the factors considered in arriving at the average cost per acre but there is nothing in the record showing the weight given to each factor and whether the average cost which was used was a weighted average of the separate costs of each acre to be restored. The latter appears especially significant in view of the evidence showing that cost of restoring each acre or tract varied greatly. Also significant is the fact that the actual cost in 1950 to 1956 (see findings of fact, *supra*) for backfilling the properties strip mined during the periods in question varied substantially from the amounts estimated. *Ralph L. Patsch*, 19 T. C. 189, 198 (1952).

We, accordingly, uphold the respondent's determination regarding this issue.

### Issue 3. Destruction of Surface Lands.

Denise acquired various tracts of surface lands overlying the coal deposits which it owned or had the right to mine. When the tracts were acquired it treated them as capital assets and the cost of the

---

[5] See footnote 3, *supra*.

tracts was capitalized. During the years involved Denise conducted strip-mining operations on those tracts and as a result the stripped areas were destroyed. Each year it estimated the portion of each tract destroyed through stripping (which portion did not coincide with the area actually stripped) and deducted a pro rata part of the cost of the land on its returns. The respondent has disallowed the entire amounts claimed.

The petitioner contends that it is entitled to the claimed deductions under section 23 (a) (1) (A) as an ordinary and necessary business expense or under section 23 (e) or (f) as a loss and relies heavily on the case of *Manchester Coal Co.*, 24 B. T. A. 577 (1931). In *Manchester Coal Co.* the fact situation was almost identical. The taxpayer was engaged in strip-mining operations. It acquired the mineral rights from one party and, in order to mine the coal, it acquired from numerous unrelated grantors the surface rights overlying the coal. The portions of the surface which were strip mined were completely destroyed. The question involved in that case was whether the taxpayer was entitled to a deduction by way of depletion on account of the exhaustion of its investment in the surface lands destroyed by the strip-mining operations. There, as here, the Commissioner argued that no identifiable event had occurred which gave rise to a deductible loss, relying on *Mrs. J. C. Pugh, Sr., Executrix*, 17 B. T. A. 429, affd. (C. A. 5, 1931) 49 F. 2d 76. However, we held (24 B. T. A. at 582) :

where the land itself is destroyed or the coal is mined, we think *that the cost of the land should be added to the cost of the coal in determining the depletion allowable.* As each ton is mined a proportionate part of the cost of the land should be attributed to it. We know the number of acres and their cost and the estimated number of tons. The total cost of the land divided by the number of tons of coal would give a fair and reasonable basis for depletion for each ton mined. [Emphasis added.]

The Commissioner published a nonacquiescence in that decision. See XI–1 C. B. 10 (1932). However, it appears that his regulations are, and have been, in accord with *Manchester Coal Co., supra.* Section 29.23 (m)–2, Regs. 111, provides that the basis of the property for depletion purposes (other than discovery or percentage depletion) is as provided in section 113, except that—

In determining the amount of the basis as adjusted applicable to the mineral deposit there shall be excluded (a) amounts representing the cost or value of the land for purposes other than mineral production, * * *

The apparent import of such provision is that the basis of property for depletion purposes should be allocated between the surface rights and the mineral rights, see *Potts Run Coal Co.*, 19 B. T. A. 1, 5 (1930), except when the surface rights are used for purposes of mineral pro-

duction. For example, in deep-mining operations or oil drilling the surface remains substantially untouched and it is not subject to depletion, but in strip-mining operations where, as here, the surface is removed and destroyed in order to remove the minerals, the entire basis (the portion applicable to both mineral and surface) is subject to depletion.

We think the holding in *Manchester Coal Co., supra,* is in point and we follow it here. The petitioner's argument that it is entitled to a deduction as a business expense or as a loss cannot be sustained. The *Manchester Coal Co.* case is not authority for that argument. It is authority for the proposition that the cost of the land is deductible as it is used up in mining operations; it is included in the depletion allowance provided for in section 23 (m). Being deductible under that section it is not deductible under section 23 (a) (1) (A) or 23 (e) or (f). The sections are mutually exclusive. Compare *Spring City Foundry Co.* v. *Commissioner,* 292 U. S. 182, 189 (1934). A contrary holding would allow a double deduction; such a result is not sanctioned by the purpose or intent of the various sections involved.

As stated previously, the issue was argued by the parties on the theory of whether or not the cost of the land constituted either a business expense or a loss, rather than on the theory under which we have decided the issue. Our holding under this issue will naturally affect the computation of the depletion allowance. It must be pointed out though that Denise is not entitled to cost depletion for the cost of the surface lands in addition to the percentage depletion already taken for the coal underlying these surface lands. Cf. *L. S. Munger,* 14 T. C. 1236, 1240 (1950). What it must do is add the cost of the land to the cost of the coal and divide the number of tons into the total cost. See Regs. 111, sec. 29.23 (m)–2. By cost of the land we mean the cost of the land overlying coal recoverable by the strip-mining method. If, for example, a 100-acre tract contains only 40 acres which has been and will be stripped, only 40 per cent of the cost of the 100-acre surface can be recovered by way of depletion. That portion of the cost will be recovered as the surface is removed and actually destroyed in the process of extracting the coal. All of the relevant amounts needed for that computation are not in the record but presumably they have been ascertained and are available to both parties. The computation, therefore, can be made under Rule 50. The amount so determined shall be used as the allowance under section 23 (m) unless it is less than the amount computed under section 114 (b) (4), which provides for percentage depletion. If cost depletion is less than percentage depletion then, of course, petitioner is entitled to use percentage depletion.

## *Issue 4. Depreciation.*

The petitioner acquired a Marion dragline shovél in 1948 at a cost of $166,304.30. On its 1948 and 1949 returns it deducted depreciation based on an estimated useful life of 8 years. The respondent partially disallowed the claimed depreciation, determining that the estimated useful life of the dragline was 12 years. Thus, the only question is the estimated useful life of the property. This determination is essentially factual in nature.

The dragline in question was operated on a 24-hour-a-day basis in a strip-mining operation. The average overburden that it was uncovering was about 50 feet; however, in some instances it uncovered up to about 75 feet. It was used in this manner from the time of purchase until 1952, when it was sold. Parties familiar with the machine and the circumstances under which it was used considered 8 years to be the maximum useful life. Considering the use to which the dragline was put we are satisfied the useful life did not exceed 8 years.

Respondent offered no evidence to rebut the testimony of the expert witnesses produced by petitioner. He contends, however, that the dragline in question was still being used in 1957. The record shows that substantial repairs were being made on the dragline in 1957 but its use, if any, subsequent to its sale in 1952 does not appear in the record.

We think Denise has borne its burden of proof and uphold it on this issue.

## *Issue 5. Advertising Expense.*

In 1948, Denise paid $7,500 for the back-page space of the official program of the 1948 Democratic National Convention held in Philadelphia and deducted that amount on its 1948 return as an ordinary and necessary business expense. The respondent disallowed the claimed deduction on the ground that it represented a political contribution.

The respondent has expressly recognized that an expenditure for the purchase of advertising space in a political convention program can represent an ordinary and necessary business expense, see Rev. Rul. 56–343, 1956–2 C. B. 115, and no contrary contention is made here. The respondent does contend, however, that the expenditure represents a political contribution mainly because Margiotti, the president and 50 per cent shareholder of Denise, was a political figure of prominence in Pennsylvania and because the matter printed on the space purchased extolled the Democratic Party rather than Denise's products.

On the facts in the record we disagree with respondent's determination as to this item and think that the record fairly supports a

finding that the expenditure in question represents an ordinary and necessary business expense incurred in Denise's business. The facts show that the sales department of Denise was approached by the advertising agency which was handling advertising for the program and that the sales department recommended that the expenditure be made. This recommendation by the sales department was approved by Margiotti.

The fact that the space was not used to extol the virtues of Denise's product does not require a holding that the expenditure represented a political contribution rather than a bona fide advertisement representing an ordinary and necessary business expense. It has long been recognized that advertisements do not have to directly praise the taxpayer's product in order to be considered ordinary and necessary business expense. See e. g., *B. F. Boyer Co.*, 4 B. T. A. 180 (1926) ; *Sanitary Farms Dairy, Inc.*, 25 T. C. 463 (1955) ; I. T. 3564, 1942-2 C. B. 87. Advertising of that type tends to create goodwill and to place the name of the advertiser before the audience of the medium used. And, as stated previously, the respondent has recognized that the political convention programs do have an audience to which it is permissible (for tax purposes) to place the taxpayer's name before, and to appeal to.

From the record we are satisfied that the purpose in making the expenditure was to publicize and create goodwill for Denise. Denise's name clearly appears on the page, the page itself is printed in very attractive color form, and readers of the program undoubtedly knew who sponsored the page in question.

The fact that Denise's advertising expenses in other years were much less than in 1948 does not render the expense nondeductible. Also, the fact that advertising in a different medium or in a different manner might have achieved more desirable results does not require us to substitute our judgment for that of the taxpayer.

A copy of the front page and the back page of the program has been introduced in evidence. The front page is a handsome picture of the American eagle and Independence Hall in Philadelphia, with no advertising on the page. The inside back-cover page of the program is a full-page advertisement in color of Old Grand-Dad bourbon whiskey with a picture of "Old Grand-Dad" himself, which is denominated "Head of the Bourbon Family." We, of course, do not have before us the question of whether the amount which National Distillers Products Corporation paid for its full-page advertisement in color of Old Grand-Dad bourbon is deductible as a business expense. Nor do we know whether the head of National Distillers Products Corporation was a member of the Democratic Party, as was Charles Margiotti, the president of petitioner. We do not think that makes any difference in determining whether the item in question is deductible

as an ordinary and necessary business expense. The main question is, was the advertisement a legitimate advertising expenditure, and we think that question must be answered in the affirmative as we have already stated.

Another phase of the question, we think, merits some discussion in view of respondent's brief and that is that there would be no reason to deny the deduction merely because it would be difficult for petitioner to show that immediate increases in coal sales resulted from the advertisement. The Tax Court would have a very difficult task in cases involving advertising expenses if it had to go into the question of how soon immediate increases in sales resulted from a particular advertisement. It is doubtless true that the makers of Old Grand-Dad bourbon whiskey might naturally expect quicker results from their page advertisement, especially among the delegates to the Democratic National Convention, than petitioner could expect from its advertisement of the more prosaic commodity of bituminous coal. But again we say we think these things make no difference. The main thing is, was the advertisement a legitimate expenditure for advertising petitioner's product, and we hold that it was.

On this issue petitioner is sustained.

### Issue 6. Unconstitutional Taxes.

Denise, an accrual basis taxpayer, accrued and deducted on its 1948 return township coal taxes in the amount of $7,599.80. As to this fact there seems to be no dispute. Of this amount, $2,611.21 was actually paid to the taxing authorities in 1948 and the balance was paid in 1949. In April 1949, the Act under which the taxes were imposed was found unconstitutional by the Supreme Court of Pennsylvania in a suit brought by someone other than petitioner. The respondent disallowed the claimed deduction in its entirety on the ground that "these taxes were found unconstitutional in 1949."

No question is raised but that the normal accrual date for the taxes in controversy was during 1948. And the facts here present do not justify a postponement of that normal accrual date.

Denise was not a party to the suit in which the taxing Act was declared unconstitutional. Denise actually paid the taxes in 1948 and 1949. This fact prohibits a finding that unpaid, contested taxes are involved. Cf. *Security Flour Mills Co.* v. *Commissioner*, 321 U. S. 281 (1944). The fact that some other taxpayer is contesting the constitutionality of the tax does not affect its accrual. If at a later date the tax is held to be unconstitutional, the original deduction will be allowed to stand and the refund of the tax, if there is ever any, will be taxed in the year when received. See Mim. 6444, 1949-2 C. B. 11. Even if petitioner had been contesting the constitutionality of the tax in 1948, which it was not, it would have been entitled to deduct the

$2,611.21 which it actually paid in that year. See *Western Cartridge Co.*, 11 T. C. 246 (1948).

We hold for the petitioner on Issue 6.

*Decisions will be entered under Rule 50.*