Dufour, Appellant, *v.* Maize et al.

Argued December 2, 1947. Before MAXEY, C. J., LINN, STERN, PATTERSON and JONES, JJ.

*Arthur H. Hull,* with him *John H. Fertig, F. Brewster Wickersham, Hull, Leiby & Metzger* and *Metzger & Wickersham,* for appellant.

*H. F. Stambaugh,* with him *T. McKeen Chidsey,* Attorney General, for appellees.

OPINION BY MR. JUSTICE LINN, January 19, 1948:

The plaintiff appeals from the dismissal of his bill filed to enjoin the defendants, officers of the Commonwealth, from enforcing against him the provision of the Act of May 31, 1945, P. L. 1198, 52 PS 1396.1, on the ground that the act is unconstitutional. It is an Act, as its title states, "Providing for the conservation and improvement of land affected in connection with the mining of bituminous coal by the open pit mining method; regulating such mining; and providing penalties." The open pit mining method is also described as strip mining or

stripping. The bill was filed on behalf of the plaintiff and other operators similarly situated who might join as parties.

The defendants filed a responsive answer. The case was tried at length; an adjudication was filed and decree nisi entered June 20, 1946, dismissing the bill. Exceptions followed, but before they were disposed of, plaintiff, on November 13, 1946, filed a petition for rehearing pursuant to Equity Rule 78. The petition set forth that, since the entry of the decree nisi, information of additional facts, not theretofore ascertainable together with the result of experience, materially affecting the decision, had been obtained which should be considered by the court. The petition was granted and a rehearing [1] was held and additional witnesses were heard. This evidence was considered with the exceptions to the adjudication. The parties presented requests for additional findings and conclusions and on August 18, 1947, a supplementary opinion was filed considering this evidence and disposing of the exceptions and entering a final decree dismissing the bill. The appeal is from that decree.

The evidence taken on the original hearing as well as the adjudication of the learned chancellor with re-

---

[1] The opinion states: "One of the reasons why we granted the rehearing was the contention that experience had shown that planting done in accordance with the provisions of the act had been unsuccessful, and resulted in a poor survival record. We are thoroughly convinced that the reasons for such poor results were largely improper planting in the first place. The roots of seedlings and young stock were allowed to dry in the sun before they were planted. In many instances the stock was not planted at the proper depth. Some were planted too deep and some too shallow. In some instances dry weather followed the planting. Had care been used, the chance of survival could have been improved.

"After having taken all the testimony and heard all the witnesses, we are completely convinced that successful planting may occur; (1) on unleveled spoil·bank; (2) on partially leveled spoil bank; and (3) when the spoil banks are restored to the original contour. Of course, in all cases, some care must be exercised. But when it is exercised, good results may be expected."

spect to it were of course reëxamined in the light of the evidence taken on the rehearing. It will be sufficient now if we indicate our reasons for affirming the decree, without reciting the evidence, etc., at length. The evidence amply supports the findings of fact on which the decree is based. We may also add that we confined our consideration to the four points set forth in appellant's Statement of Questions Involved: rule 50.

The purpose of the Act is stated in the first section. "Section 1. This act shall be deemed to be an exercise of the police powers of the Commonwealth for the general welfare of the people of the Commonwealth, by providing for the conservation and improvement of areas of land affected in the mining of bituminous coal by the open pit or stripping method, to aid thereby in the protection of birds and wild life, to enhance the value of such land for taxation, to decrease soil erosion, to aid in the prevention of the pollution of rivers and streams, to prevent combustion of unmined coal, and generally to improve the use and enjoyment of said lands."

There can be no doubt that under the police power the Commonwealth may do what this Act was intended to accomplish.[2] There is a presumption of constitutionality.

1. Appellant contends the Act violates Article III, section 7, of the Constitution, prohibiting the enactment of any local or special law "regulating labor, trade, mining or manufacturing." He states the objection to be "that the bituminous coal stripping business may not be classified to regulate the conservation of land." We can find no sound basis for plaintiff's objection to the classification made by the Act. The facts in the record, supported by evidence, clearly bring the classification within

---

[2] Compare *Haverford Twp. v. Siegle*, 346 Pa. 1, 28 A. 2d 786; *Equitable Credit Co. v. Geier*, 342 Pa. 445, 21 A. 2d 53; *Maurer v. Boardman*, 336 Pa. 17, 7 A. 2d 466; *Farmers-Kissinger Market House Co. v. Reading*, 310 Pa. 493, 165 A. 398; *Com. v. Plymouth Coal Co.*, 232 Pa. 141, 81 A. 148, s. c. 232 U.S. 531; *Iben v. Monaca Borough*, 158 Pa. Superior Ct. 46, 43 A. 2d 425.

the well established rule stated by Mr. Justice MITCHELL in *Seabolt v. Commissioners,* 187 Pa. 318, 41 A. 22: "Legislation for a class distinguished from a general subject is not special, but general, and classification is a legislative question, subject to judicial revision only so far as to see that it is founded on real distinctions in the subjects classified, and not on artificial or irrelevant ones used for the purpose of evading the constitutional prohibition. If the distinctions are genuine, the courts cannot declare the classification void, though they may not consider it to be on a sound basis. The test is, not wisdom, but good faith in the classification."

We quote the following from the adjudication of the learned chancellor: "The record in this case shows that the strip mining of bituminous coal produces certain results not produced by the drift or deep mining methods of recovering such coal. The pit mining method produces a spoil bank over all of the surface mined. It creates an irregular surface which affects its utility for the production of fruits of the soil. In many cases the spoil bank contains material which is not only unsuitable for agricultural use, but which washes into streams and upon adjoining property. This method is also invariably used in the vicinity of deep mines. There is danger of flooding such mines, which either causes them to be abandoned or necessitates the pumping of the water therefrom. This water is invariably acid, and when it reaches the streams of the Commonwealth it is destructive to fish and various aquatic life, and in some cases ruins sources of water supply utilized by individuals and communities. There is also a danger of cutting into a deep mine and thereby interrupting the ventilating system, with attendant danger to the miners there employed. Also, this method of producing bituminous coal always leaves exposed, at the foot of the high wall, a vein of coal. This coal may be ignited by intent or carelessness and burn into a deep mine, causing great expense, loss and destruction of natural re-

sources. The mining of other materials by the stripping method does not produce all of these results. It does produce a spoil pile, but no evidence has been produced of any case where there was water in a cut, where the operation adjoined a deep mine, or where a vein of coal was left exposed at the bottom of the cut. Consequently in this type of mining there is not the same danger of fire, flooding or interruption of ventilating systems of deep mines, as exists in the strip mining of bituminous coal. Also, anthracite coal has a higher combustion point than bituminous coal. These are substantial and real differences which, in our opinion, justify the classification made by the act. It may be true, that other evils exist in the strip mining of other products which should be corrected by the legislature. However, a start has been made, and there is authority for the proposition that when an evil is conspicuously in need of correction, action may be taken, although other evils exist which are not corrected."

2. Appellant's second objection is that the Act deprives him of his property without due process of law contrary to Article I, sections 1 and 9, of the Constitution.

The short title of the Act is, "Bituminous Coal Open Pit Mining Conservation Act." "Open pit mining" is described as the "recovery of bituminous coal by removing the strata or material which overlies or is above the coal deposit or seam in its natural condition." "Overburden" is defined to mean the "material overlying a bituminous coal deposit in its natural state . . ." "Spoil pile" is "the overburden and reject coal as it is piled or deposited in open pit mining."

Section 4 requires an operator proposing to engage in strip mining to register with the Department of Mines; to file a certificate giving certain information including "an estimate of the number of acres of land that the operator will affect by open pit mining during

one year immediately following the date of filing.". He must also file a bond conditioned to "perform all of the requirements of this act. The bond shall be in the amount of two hundred dollars ($200.00) per acre based upon the number of acres of coal which the operator estimates that will be stripped by open pit mining during one year immediately thereafter: Provided, That no bond shall be for less than two thousand dollars ($2,000.00) . . ." Provision is also made for the alternative deposit of cash or government bonds, their custody, etc. Section 5 provides that "Within thirty (30) days after starting the removal of overburden . . . the operator shall file" with the Department certain information specified. Section 6 provides that "Within six (6) months after the operation is finished or abandoned, the operator shall file . . ." a completion report giving information required. Section 7 provides that "If the operation is not completed or abandoned within one year following the date of filing the certificate, the operator shall, within sixty (60) days" file an annual report giving information required. Section 8 provides that on receipt of the completion report the Secretary of Mines shall charge the area affected by open pit mining against the bond or deposit filed by the operator at the rate of $200 per acre. Provision is made for an appropriate certificate if the mining exceeds or is less than the estimate. Section 9 provides for pit mining beyond the period for which the certificate had been filed. Section 10 provides that "Within one year after the operation is completed, the operator shall place sufficient over burden in the open cut to cover the exposed face of the unmined coal" and specifies how the covering shall be done. Sections 11, 12, 13 and 14 provide for the planting of trees, shrubs and grasses under the supervision of the Secretary of Forests and Waters, and for reports, approval, etc. Section 15 provides for procedure in the event of default covered by the operator's bond. Section

16 makes open pit mining without registering a misdemeanor and provides a penalty. Section 17 provides that the Act shall not apply where the mining is less than 250 tons in any period of 12 successive calendar months.

Section 18 provides that the money received by the Secretary of Mines from registration fees and from forfeiture of bonds and cash deposits and securities shall be held by the State Treasurer in a special fund to be known as "Bituminous Coal Open Pit Mining Reclamation Fund" and shall be used by the Secretary of Forests and Waters for the sole purpose of foresting or reclaiming land affected by open pit mining.

The contention that forced compliance with the Act takes plaintiff's property without due process seems based on his assertion that the cost is "grossly out of all proportion to the object which the act seeks to attain." There is a good deal of evidence concerning this subject and the learned court below dealt adequately with it. Plaintiff, who had the burden of proof, did not show that the registration fee exceeds the cost of administration.[3] A surety company's charge for the required bond is given as $25.00 per year. Notwithstanding plaintiff's complaint of the cost, we gather from the evidence that his stripping operation promises handsome profits. The plaintiff with his two sons do the work. While he testified that his 65 acres of land, including the seam of coal, were worth only $150.00 in all, the evidence supports the 54th finding, "54. Plaintiff estimated that he would strip not more than two acres in a year, but such two acres of coal twenty-four inches thick would produce a total of 3,400 tons which, at $3.10 per ton, would produce $13,800.00 a year." There is no showing whatever that the Act imposes an undue burden on the industry, without now attempting to define what would be an undue burden or what the legal effect of it would

[3] Compare *Adams v. City of New Kensington*, 357 Pa. 557.

be. That additional cost of operation results does not make the statute unconstitutional: compare *Com. v. Plymouth Coal Co.,* 232 Pa. 141, 81 A. 148, s.c., 232 U.S. 531. Plaintiff's operation is a very small part of the industry. The court affirmed defendant's 20th request for findings of fact, as follows: "20. The number of tons of bituminous coal recovered by strip mining in Pennsylvania has increased nearly tenfold in the past five years, as is shown by the following figures:

| Year | Tons |
|------|------|
| 1939 | 2,792,966 |
| 1940 | 2,808,607 |
| 1941 | 6,463,160 |
| 1942 | 10,313,160 |
| 1943 | 17,177,054 |
| 1944 | 22,211,661 |

At the end of the calendar year 1944 there were 435 strip mining operations for bituminous coal in Pennsylvania."

Plaintiff's position [4] seems to be that what the statute requires to be done on the land is a desirable object of legislation, but that the legislature has not chosen the best method of reclamation. This constitutes a mere difference of opinion on methods concerning which the legislature had the duty of choosing. Compare *Queenside Hills Realty Co. v. Saxe,* 328 U.S. 80, 82; *Northwestern Laundry v. DesMoines,* 239 U.S. 486, 491. "The test is, not wisdom but good faith in the classification." (supra)

3. Plaintiff's third contention is that the use made by the Commonwealth of the license fees and other sums received in the administration of the Act constitutes a violation of Article III, section 18, of the Constitution

---

[4] Plaintiff's brief states: "We thus submit that the most serious financial burdens which this act imposes in the interests of conservation are wholly out of proportion to the benefits to be achieved since substantially the same results may be accomplished without compliance therewith."

which prohibits appropriations "for charitable, educational or benevolent purposes, to any person or community, nor to any denominational or sectarian institution; corporation or association."

Section 18 of the Act provides that the sums deposited with the State Treasurer "shall be used by the Secretary of Forests and Waters for the sole purpose of foresting or reclaiming land affected by open pit mining of bituminous coal, and for such purposes are hereby specifically appropriated to the Department of Forests and Waters. Funds received from the forfeiture of bonds and cash deposited in lieu of bonds shall be expended by the Secretary of Forests and Waters upon lands situated in the county in which the operation upon which liability was charged on the bond is located, and the money in said funds to be spent at the discretion of the Secretary of Forests and Waters for back-filling or planting." This disposition of the funds received in administering the Act is not an appropriation within the meaning of Article III, section 18. In *Commonwealth ex rel. Bell v. Powell*, 249 Pa. 144, 94 A. 746, it was contended that the disposition of motor vehicle registration and license fees pursuant to the Act of July 7, 1913, P. L. 672, was an appropriation within Article III, section 18, but the contention was rejected. What was then said of that disposition of the registration and license fees is applicable now. "It [the same constitutional provision] has no application to a fund created for a special purpose and dedicated by the act under which such fund is to be created to a particular use. The appropriation of the fund so created continues so long as the act which dedicates it to a particular use remains in force." (249 Pa. at 154) See, also, *Com. v. Perkins*, 342 Pa. 529, 533, 21 A. 2d 45.

4. Plaintiff's fourth and last contention is that the Act is unconstitutional "in levying taxes that are not uniform." That provision does not prohibit proper

classification of subjects of taxation; all that it requires is that the tax shall be uniform on the members of the class.

Section 4 provides that ". . . Contemporaneous, with and as a condition precedent, to the filing of said certificate and any renewal thereof, the operator shall pay to the Department a filing fee of one hundred dollars ($100.00)."

The classification is within the power of the legislature because the record shows substantial differences between bituminous coal mining by the open pit method and the other mining or quarrying [5] suggested in the argument as industries or occupations which should have been included in the same class. The payment of the registration fee must be made by all the operators in this class. There is, therefore, no basis for the suggestion that the Act does not operate uniformly on all the members of the class.

While the learned judge thought that the registration fee is a "tax for the privilege of mining bituminous coal by the open pit method," he also said, "We may interpolate, however, that should it be finally determined that the $100 registration fee is in fact a license fee, it would not affect the general conclusions we have reached in this opinion. It would merely make irrelevant a number of the questions raised by the plaintiff."

In the Commonwealth's brief it is contended that the $100 payment "is clearly a license fee and not a tax." We agree with the learned court below that it is not material in disposing of this appeal, whether the required payment is called a filing fee, as the legislature called it, or a license fee, or a tax. There is no discrimination; the fee must be paid by every operator in the class. Presumably the amount is reasonable: *Rock v. Philadelphia*, 328 Pa. 382, 196 A. 59. In *Pennsylvania Liquor Control Board v. Publicker Commercial Alcohol*

---

[5] Ganister, shale, flint clay, limestone, iron ore and cannel coal.

*Co.,* 347 Pa. 555, at page 560, Mr. Justice Drew defined a license fee as follows: ". . . A license fee is a charge which is imposed by the sovereign, in the exercise of its police power, upon a person within its jurisdiction for the privilege of performing certain acts and which has for its purpose the defraying of the expense of the regulation of such acts for the benefit of the general public; it is not the equivalent of or in lieu of an excise or a property tax, which is levied by virtue of the government's taxing power solely for the purpose of raising revenue . . ."

We may take the words in the statute at their face value. In *Oil City v. Oil City Trust Co.,* 151 Pa. 454, 457, 25 A. 124, Mr. Justice Mitchell said: ". . . On its face it purports to be a license fee on the occupation of banking, and though we may suppose it was not imposed without an eye to the increase of revenue, yet its good faith and the reasonableness of its amount are not questioned here, and the presumption therefore is that it is what it professes to be: Johnson v. Philadelphia, 60 Pa. 445." To strip-mine without registration is a misdemeanor and registration involves the payment by every operator of the filing fee as a prerequisite to mining.

The Act does not provide, as the appellant argues, "for the assessment of a tax at the rate of $200 per acre on land on which bituminous coal has been mined by the open pit or strip mining method." If the operator complies with the conditions of his bond he is not required to pay anything to the Commonwealth, excepting the registration filing fee.

Decree affirmed at the costs of appellant.

---

DISSENTING OPINION BY MR. JUSTICE PATTERSON:

The Bituminous Coal Open Pit Mining Conservation Act (Act of 1945, P. L. 1198, 52 PS Section 1396.1 et seq.) violates Article 3, Section 7 of the Pennsylvania

Constitution [1] and the equal protection clause of the Fourteenth Amendment to the Federal Constitution. [2] The purpose of the Act is to provide "for the conservation and improvement of areas of land affected in the mining of bituminous coal by the open pit or stripping method, to aid thereby in the protection of birds and wild life, to enhance the value of such land for taxation, to decrease soil erosion, to aid in the prevention of the pollution of rivers and streams, to prevent combustion of unmined coal, and generally to improve the use and enjoyment of said lands." The record does not reveal any material differences between persons subject to the Act and persons similarly situated but not subject thereto. There has been classification within a class based upon the fact of industry; not upon real and substantial differences relating to the primary purpose to be achieved.

Legislation based upon classification can be sustained only where there is "a necessity springing from manifest peculiarities, clearly distinguishing those of one class from each of the other classes, and imperatively demanding legislation for each class, separately, that would be useless and detrimental to the others": *Ayars Appeal*, 122 Pa. 266, 281, 16 A. 356; *Heisler v. Thomas Colliery Co. et al.*, 274 Pa. 448, 454, 118 A. 394; *Ashworth v. Pittsburgh Rys. Co.*, 231 Pa. 539, 542, 80 A. 981. Classification, to be valid, must rest not merely upon a difference of conditions (*Commonwealth v. Casey*, 231 Pa. 170, 179, 80 A. 78) but those differences must bear a substantial, natural, reasonable and just relation

[1] "The General Assembly shall not pass any local or special law: Regulating labor, trade, mining or manufacturing": Pennsylvania Constitution, Art. 3, Section 7.

[2] "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws": Constitution of the United States, Art. 14, Section 2.

to the evil which the legislature seeks to remedy or remove. It must be reasonably adapted to secure a legitimate public interest: 12 Am. Jur. 147, Constitutional Law, Section 480.

The existence of an evil in the instant case may readily be conceded—the destruction of land by erosion, deforestation, pollution of streams, and depreciation of land value for purposes of taxation. The power of the legislature to remedy that evil may likewise be conceded. That power must, however, be exercised consistent with constitutional principles requiring enactment of equal laws to be equally applied. In *Commonwealth v. Clark,* 195 Pa. 634, 46 A. 286, this Court said (p. 637) : "It is true, as urged, that the equal protection of the laws herein enjoined is a pledge of the protection of equal laws (Yick Wo v. Hopkins, 118 U.S. 369) ; but it does not forbid a classification of persons or property for various purposes, nor enjoin upon the legislative authorities the impossible duty of making the same or equal laws for the several classes. It does compel the equal application of the laws to all members of the same class, allowing classification, which should be based upon reasonable grounds and is not a mere arbitrary selection : Gulf, Colorado & Santa Fe Ry. v. Ellis, 165 U.S. 165."

The constitutional basis for legislative classification under Article 3, Section 7, differs materially from classification under Article 9, Section 1. In the latter the legislative power to classify subjects of taxation is expressly recognized; in the former the legislature is specifically enjoined from passing any local or special law. In *Heisler v. Thomas Colliery Co. et al.,* supra, this Court, in comparing the two sections of the Constitution, said (p. 454) : ". . . . it is clear that an entirely different situation exists when the question arises under article III, section 7, for there no power to classify is conceded, indeed, impliedly at least, it is denied; hence legislation, based on classification regarding the sub-

jects there specified in it, can be sustained only where there is 'a necessity springing from manifest peculiarities clearly distinguishing those of one class from each of the other classes, and imperatively demanding legislation for each class, separately, that would be useless and detrimental to the others' (Ayars's App., 122 Pa. 266, 281; Com. v. Schumaker, 255 Pa. 67, 70), a statement wholly inappropriate when speaking of cases arising under article IX, section 1." It is clear, therefore, that the legislature, in the exercise of its police power to secure a legitimate end—conservation of land—cannot constitutionally restrict the orbit of its regulation to a given person in the absence of "a necessity springing from manifest peculiarities clearly distinguishing those of one class from each of the other classes, and imperatively demanding legislation for each class, separately, that would be useless and detrimental to the others." It cannot be doubted that all engaged in open pit and strip mining operations could properly be placed in a separate class. Here the classification is challenged for the reason that those persons engaged in the stripping of *bituminous coal* have been singled out from all who are similarly engaged in the open pit or strip mining of minerals. The Act does not apply to all within the class, i. e., to all persons engaged in open pit or strip mining, but only to those engaged in the mining of bituminous coal. Cf. *Chalmers v. City of Philadelphia*, 250 Pa. 251, 255, 95 A. 427.

Justification for singling out this special industry is centered upon the following differences: There is no evidence that in other stripping operations there has been found water in a cut that the operations adjoin a deep mine or that a vein of coal was left exposed at the bottom of the cut. Consequently there are differences as regards danger from fire, flooding, or interrupting ventilating systems of deep mine, and a higher combustion point of anthracite coal. The majority opinion

states: "These are substantial and real differences which, in our opinion, justify the classification made by the Act." Appellant's points for charge, which were affirmed by the hearing judge, would establish the following facts: There is a seam of bituminous coal above fireclay; the latter is recovered by open pit or stripping methods identical to that employed in the stripping of bituminous coal; spoil pits resulting from clay stripping are wider and bituminous coal found above the clay is usually mixed with the spoil pile; spontaneous combustion may occur in spoil piles but there is no evidence that spontaneous combusion has occurred in an exposed vein of bituminous coal anywhere in the United States. "Ganister, employed in the manufacture of silica brick, shale from which is manufactured sewer pipe, flint clay, limestone, iron ore and cannel coal are all mined in the State of Pennsylvania by the open pit or strip mining method identical to that employed in the stripping of bituminous coal, all of which operations are productive of spoil banks."

Having regard for the stated purposes of the legislation, supra, the industries which create those conditions cannot be treated differently. They are, insofar as the purposes of the legislation are concerned, similarly situated and must be subjected to equal regulation. The singling out of the bituminous industry is without reasonable basis in fact, and constitutes an unconstitutional classification denying to appellant substantive rights under both the Pennsylvania and the federal Constitutions.

The majority opinion seeks to avoid the inequality of application by stating that "there is authority for the proposition that when an evil is conspicuously in need of correction, action may be taken, although other evils exist which are not corrected." Admitting the rule, it is inapplicable here. *Maurer v. Boardman et al.,* 336 Pa. 17, 7 A. 2d 466, is illustrative of the authority to which

the majority refers. In that case this Court held constitutional the Act of 1937, P. L. 2329, 2401, forbidding operation upon the highways of this Commonwealth of a vehicle carrying an automobile over the cab or head of the operator of the carrier vehicle. This Court said (p. 26) : "Here the evil sought to be prevented is the practice of carrying an automobile over the cab of a vehicle. The legislature by enacting Section 1033(c) has efficiently directed its effort toward the prohibition of that practice. That other persons in the trucking business may continue to engage in practices not prohibited by Section 1033(c), but equally and similarly, dangerous, is not enough to render the Section in question unconstitutional, because the right of the legislature to classify with reference to the particular evil sought to be prevented is undoubted. An act designed to remedy an existing ill may not be declared invalid because it leaves other ills unremedied. It is not required that the entire field of possible abuses be covered: Patsone v. Com. of Pa., 232 U.S. 138; Keokee Consolidated Coke Co. v. Taylor, 234 U.S. 224; Clark v. Paul Gray, Inc., et al., 83 L. Ed. (Adv.) 736." All similarly situated were subject to the Act and that there were other dangers which were not prevented was held not to invalidate the statute in question. In the instant case all similarly situated are not subject to the Act and instead only those persons engaged in open pit or strip mining of bituminous coal have been regulated.

The legislature has arbitrarily created a class. There are no substantial, natural and reasonable differences which bear a just relation to the evil which the legislature seeks to remedy. The Bituminous Coal Open Pit Mining Conservation Act violates Article 3, Section 7 of the Pennsylvania Constitution and denies to appellant the equal protection of the law guaranteed by the Fourteenth Amendment to the federal Constitution.

The decree of the Court below should be reversed.