554 P.2d 969
**STATE of Idaho ex rel. Cecil D. ANDRUS, Governor, et al., Plaintiff-Appellant,**

**v.**

**James CLICK, Sr., et al., Defendants-Respondents.**

**No. 11926.**

Supreme Court of Idaho.

Sept. 24, 1976.

Wayne L. Kidwell, Atty. Gen., Terry E. Coffin, Deputy Atty. Gen., Boise, for plaintiff-appellant.

V. Frank Mendicino, Atty. Gen., Steve F. Freudenthal, Sp. Asst. Atty. Gen., Cheyenne, Wyo., as amicus curiae.

Barry Marcus, of Marcus & Marcus, Boise, for defendants-respondents.

DONALDSON, Justice.

The defendants-respondents, James Click, Sr., Eugene Weiss, and Oral (Orral) Lake, are residents of Montana doing business in Idaho as a mining partnership. They conduct a dredge mining operation upon unpatented federal public domain land within the St. Joe National Forest in Idaho under valid federal mining claims. The operation adjoins a section of Sherlock Creek, a tributary of the St. Joe River.

Respondents have conducted their mining operation without acquiring or applying for a permit from the State of Idaho to do so, as required by the Idaho Dredge and Placer Mining Protection Act, I.C. Title 47, ch. 13 (hereinafter, Dredge Mining Act). In conformance with the procedure set forth in I.C. § 47–1324 plaintiff-appellant State of Idaho, on the relation of the Board of Land Commissioners, sought to enjoin respondents' mining operation by filing an action in the Federal District Court for the State of Idaho. A counterclaim was filed by respondents requesting the district court to declare the Act unconstitutional. Although the federal court dismissed the complaint for lack of jurisdiction, a three judge court was impaneled to hear the issues presented by the counterclaim. Subsequently, however, on March 24, 1972 appellant commenced this action in First Judicial District Court whereupon the federal court abstained from further action pending the outcome.

By this action the board of land commissioners seeks to enjoin respondent miners from further mining activity on their claims until they comply with the Dredge Mining Act.[1] A preliminary injunction was granted on December 28, 1972 restraining respondents from conducting any dredge or placer mining operations. The respondents answered and counterclaimed on February 5, 1973 asking for a declaratory judgment decreeing the Dredge Mining Act unconstitutional. Following a hearing on January 24, 1974, the district court found for the respondents, dissolved the preliminary injunction and enjoined the State of Idaho from attempting to regulate, restrict or prevent the operations of the defendants under the Idaho Dredge Mining Act. The State of Idaho appeals.

It was the conclusion of the district court that the Dredge Mining Act would interfere with the property power of Congress if applied to unpatented mining claims located on the federal public domain. Congress is granted power to manage public domain property by the Proper-

1. The Idaho State Board of Health joined in this action and in the federal action claiming that defendants had failed also to comply with other statutory requirements. They were removed as plaintiffs by stipulation of the parties. The Idaho district court determined the Dredge Mining Act to be the only act in question.

ty Clause, Article IV, § 3, clause 2 of the United States Constitution. That clause gives Congress the "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States * * *."

The United States Supreme Court recently pointed out that "while the furthest reaches of the power granted by the Property Clause have not yet been definitively resolved, we have repeatedly observed that '[t]he power over the public land thus entrusted to Congress is without limitations.' * * * In short, Congress exercises the powers both of a proprietor and of a legislature over the public domain." *Kleppe v. New Mexico,* — U.S. —, —, 96 S.Ct. 2285, 2291–92, 49 L.Ed. 2d 34 (1976). Most certainly then, where Congress has exercised its legislative prerogative, conflicting state laws must fall by reason of the Supremacy Clause. U.S. Const. art. VI, clause 2. Absent congressional action, however, the state retains jurisdiction over federal lands within its territory. *Kleppe v. New Mexico, supra.* The rule was stated in *Omaechevarria v. Idaho,* 246 U.S. 343, 38 S.Ct. 323, 325, 62 L.Ed. 763 (1918):

> "The police power of the state extends over the federal public domain, at least when there is no legislation by Congress on the subject."

*See also McKelvey v. United States,* 260 U.S. 353, 43 S.Ct. 132, 67 L.Ed. 301 (1922).

The difficulty, of course, is to determine whether there is superseding federal legislation "on the subject." Our determinaton is guided where possible by applicable principles of federal preemption. These cannot, however, provide precise guidelines "for each case turns on the peculiarities and special features of the federal regulatory scheme in question." *City of Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973).

Consequently, we begin with an examination of the provisions of the applicable state and federal legislation.

The foundation for federal mining law was laid by the Act of May 10, 1872, 17 Stat. 91 (codified at 30 U.S.C. § 21 et seq.). That Act provides that, in order to encourage development of mineral resources, citizens may enter and explore the public domain with the purpose of locating valuable mineral deposits. 30 U.S.C. § 22. The locator has the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, 30 U.S.C. § 26. These provisions are equally applicable to placer miners. 30 U. S.C. § 35. In addition, the locator is granted the right to remove surface vegetation and to cut timber as may be necessary for mining purposes as well as to appropriate needed water. 30 U.S.C. § 612; *see also* 54 Am.Jur.2d *Mines and Minerals* § 57 (1971). In order to retain his claim the locator is required to expend $100 of labor or improvements each year. 30 U.S. C. § 28. The locator may obtain fee title to the land by meeting the requirements necessary to obtain a patent. 30 U.S.C. § 29.

The Idaho Dredge and Placer Mining Protection Act was enacted in 1955.[2] The Act is administered by the Idaho State Board of Land Commissioners which is empowered to adopt rules and regulations for its administration and to "make such inquiries and investigations and conduct such hearings as the board shall deem advisable or necessary." I.C. § 47–1316. In general, the Act requires operators of dredge or placer mines on lands and beds of streams in the State of Idaho to obtain a permit. In order to obtain the permit the operator must pay a set fee, I.C. § 47–1317(a), and obtain a surety bond (minimum $10,000 for ten acres or less) conditioned for faithful performance. He may

2. Submitted as an initiative measure November 2, 1954, the proposal was approved by a majority of the voters, 174,377 votes being cast for the proposal and 30,102 votes being cast against.

post cash in lieu of the bond. I.C. § 47–1317(b). Should the applicant for the permit not be the owner of the land, the owner of the lands must endorse his approval on the application for the permit. I.C. § 47–1317(e). The board can deny an application for a permit,

"on state land, stream or river beds, or on any unpatented mining claims, upon its determination that a dredge mining operation on the land proposed would not be in the public interest, giving consideration to economic factors, recreational use for such lands, fish and wildlife habitat and other factors which in the judgment of the state land board may be pertinent." I.C. § 47–1317(h).

Once obtained, a permit is not transferable. I.C. § 47–1317(f).

Where the permittee disturbs the ground in conducting his operation, he is required to level and smooth over such ground "reasonably comparable with the natural contour of the ground prior to such disturbance, and to a condition conducive to the growth of verdure." I.C. § 47–1314. This must be done "within sixty (60) days after the disturbance of the ground * * * or such longer and reasonable period of time, not to exceed two (2) years, as may be granted by the director of the department of lands in any particular case, to meet land and watercourse restoration requirements." I.C. § 47–1321. Should substantial topsoil have been removed the operator is required to replace topsoil and plant grass, trees and other vegetation so as to restore the land to its original condition "insofar as is reasonably possible after the conclusion of the dredging operation." I.C. § 47–1314. Any watercourse disturbed by the dredging must be replaced on meander lines with pool structure conducive to good fish and wildlife habitat and recreational use, I.C. § 47–1314, and where water used in mining flows into a stream the operator must construct settling ponds and use filtration processes adequate to clarify the water to conform to the standards and regulations of the state board of health for water quality control (now the department of health and welfare. See I.C. § 39–105). I.C. § 47–1315.

In order to determine compliance with these provisions the state board of land commissioners is empowered to conduct periodic inspections of the operations. The cost of the inspections is to be borne by the permittee "which such costs and expenses shall constitute a lien upon the lands specified in the permit and the minerals produced therefrom." I.C. § 47–1317(d).

Violation of the terms of the Act can result in a termination of the permit, I.C. § 47–1318, or forfeiture of the bond, I.C. § 47–1319. In addition, a failure to comply with the Act is declared to be a misdemeanor. I.C. § 47–1321. The state board of land commissioners is also empowered to bring an action to enjoin those operators who do not hold permits. I.C. § 47–1324. Procedures for hearings and appeal are provided for by I.C. §§ 47–1318 and 47–1320.

■■■■ Where there is a direct collision between state and federal legislation our task is simple, the federal legislation would preempt state legislation by reason of the supremacy clause, United States Const. art. VI, clause 2; *Florida Lime and Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 929, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963). However, state regulation which is more stringent than that under the federal legislation is not the type of conflicting legislation described by this standard. *See e. g., Northern States Power Co. v. Minnesota,* 447 F. 2d 1143 (8th Cir. 1971) (involving Minnesota pollution control requirements substantially more stringent than federal regulations). That is, the mere fact that federal legislation sets low standards of compliance does not imply that the federal legislation grants a right to an absence of further regulation. On the other hand, where a right is granted by the federal legislation, state regulation which rendered it impossible to exercise that right would be in conflict.

■ We find no such conflict is presented by the provisions of the Idaho Act requiring a permit or the restoration of the land.[3] Neither the requirement of obtaining a permit or of restoring the land render it impossible to exercise rights specifically granted by the federal legislation, although they may make it more difficult. Respondents argue that restoration requirements could render it impossible for them to mine their remaining lode deposits following the termination of their dredge operation. They assert they would have to reexcavate much of the restored land. Certainly, under the standard enunciated above these provisions of the Idaho Act would be unenforceable to the extent they rendered it impossible to mine the lode deposit. However, we find no such impossibility presented on the face of the statute. Indeed, in the present case there was some evidence that lode and dredge operations would be conducted simultaneously.

■ The absence of further direct conflict between the state and federal legislation does not necessarily close the question of federal preemption. Congress can preempt even harmonious state regulation where it so intends. Such an intent can be evidenced either expressly or by implication. *See Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947); *Northern States Power Company v. Minnesota, supra.* The court in *Rice* pointed out:

> "It is often a perplexing question whether Congress has precluded state action or by the choice of selective regulatory measures has left the police power of the

States undisturbed except as the state and federal regulations collide." 331 U. S. at 230–31, 67 S.Ct. at 1152.

■ In *Northern States Power Company v. Minnesota, supra*, the court sought to list the key factors in making such a determination. They include, *inter alia*: (1) the aim and intent of Congress as revealed by the statute itself and its legislative history, (2) the pervasiveness of the federal regulatory scheme as authorized and directed by the legislation and as carried into effect by the federal administrative agency, (3) the nature of the subject matter regulated and whether it is one which demands exclusive federal regulation in order to achieve uniformity vital to national interests, and (4) whether under the circumstances of a particular case state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *See also Rice v. Santa Fe Elevator Corp., supra.*

■ At the outset we point out that

> "In determining whether state regulation has been pre-empted by federal action, 'the intent to supersede the exercise by the state of its police power as to matters not covered by the Federal legislation is not to be inferred from the mere fact that Congress has seen fit to circumscribe its regulation and to occupy a limited field. In other words, such intent is not to be implied unless the act of Congress, fairly interpreted, is in actual conflict with the law of the state.'" *Huron Portland Cement Co. v. City of Detroit, Mich.*, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960) citing *Savage*

3. Respondents also contend that the permit requirement is unconstitutional because it is in direct conflict with federal legislation. Idaho Code § 47–1317(h) empowers the Board of Land Commissioners to deny any application for a permit "upon its determination that a dredge mining operation * * * would not be in the public interest." Respondents contend that the Board cannot have such power since Congress has already determined that the development of placer and lode mineral deposits is in the national interest, citing 30 U.S.C. §§ 21a, 22. They argue that since the Board's authority to deny applications for permits is unconstitutionally overbroad, the permit requirement is invalid. In the present case, however, there was no application for a permit and no determination by the Board that respondents' operation was not in the public interest. We therefore decline to decide whether I.C. § 47–1317(h) would be unconstitutional if used to deny a permit application from respondents. *Curtis v. Child*, 95 Idaho 63, 501 P.2d 1374 (1972); *State v. Clark*, 88 Idaho 365, 399 P.2d 955 (1965).

v. *Jones,* 225 U.S. 501, 533, 32 S.Ct. 715, 56 L.Ed. 1182 (1912).

Consequently, we put aside respondents' suggestion that the state has no power to license an activity sanctioned by the federal government. This would not be so even if the federal government had issued a license of its own. In *Florida Lime and Avocado Growers, Inc. v. Paul, supra* the United States Supreme Court held in a related area:

"[I]t is suggested that a federal license or certificate of compliance with minimum federal standards immunizes the licensed commerce from inconsistent or more demanding state regulations. While this suggestion draws some support from decisions which have invalidated direct state interference with the activities of interstate *carriers, Castle v. Hayes Freight Lines, Inc.,* 348 U.S. 61, 75 S.Ct. 191, 99 L.Ed. 68, even in that field of paramount federal concern the suggestion has been significantly qualified, e. g., *Huron Portland Cement Co. v. Detroit,* 362 U.S. 440, 447–448, 80 S.Ct. 813, 818, 4 L.Ed.2d 852; *Kelly v. Washington,* 302 U.S. 1, 58 S.Ct. 87, 82 L.Ed. 3; cf. *Bradley v. Public Utilities Comm'n,* 289 U.S. 92, 53 S.Ct. 577, 77 L.Ed. 1053. That no State may completely exclude federally licensed commerce is indisputable, but that principle has no application to this case." 373 U.S. at 141–42, 83 S. Ct. at 1217.

Returning to the factors enunciated above, we find nothing in the federal statute or its legislative history to indicate an intent to preempt state regulation. Indeed, the federal statute specifically recognizes the state's right to impose additional requirements in some areas. For example, even where standards are set for the location of mining claims, nonconflicting state requirements are upheld. 30 U.S.C. § 26; I.C. § 47–601 et seq.

Nor can the federal statute be characterized as a pervasive regulatory scheme. If anything, the federal statute is characterized by its absence of regulation. Although the Forest Service recently promulgated regulations which purport to give them a greater part in the control of mining operations, 39 Fed.Reg. 31317–21, both these regulations and the statutes authorizing their promulgation specifically recognize the viability of existing state regulations. 16 U.S.C. §§ 551, 551a.

We also fail to find preemptive qualities in the nature of the subject matter regulated. As stated in *Mendiola v. Graham,* 139 Or. 592, 10 P.2d 911, 915 (1932):

"It will not be contended that the federal government has not the right to conserve the natural resources of the public domain, and, where the federal government has not acted, the state, through its police power, may exercise such right and privilege. The state, as well as the United States, is vitally interested in preserving the natural resources within its boundaries."

Indeed, the preservation of the environmental quality of its lands is a subject particularly suited to administration by the states. Congress has recognized that even where extensive federal environmental legislation exists, the primary responsibility for implementing environmental policy rests with state and local governments. 42 U.S.C. § 4371(b)(2); *see also* 42 U.S.C. § 4331(a).

Finally, respondents assert that implementation of the Dredge Mining Act would interfere with the objectives and purpose of Congress. This purpose, they assert, is to encourage the development of valuable mineral deposits.

■ We grant that enactment of the Act of May 10, 1872 was prompted mainly by hopes of economic development. *Heydenfeldt v. Daney Gold and Silver Mining Co.,* 93 U.S. 634, 23 L.Ed. 995 (1877). Concern for the environmental impact of this development, if present, was not voiced. Nevertheless, in recent years that extreme policy has been tempered.

■ In the Mining and Minerals Policy Act of 1970 Congress stated its policy as follows:

"The Congress declares that it is the continuing policy of the Federal Government in the national interest to foster and encourage private enterprise in (1) the development of economically sound and stable domestic mining, minerals, metals and mineral reclamation industries, (2) the orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help assure satisfaction of industrial, security and environmental needs, (3) mining, mineral, and metallurgical research, including the use and recycling of scrap to promote the wise and efficient use of our natural and reclaimable mineral resources, and (4) the study and development of methods for the disposal, control, and reclamation of mineral waste products, and the reclamation of mined land, so as to lessen any adverse impact of mineral extraction and processing upon the physical environment that may result from mining or mineral activities." 30 U.S.C. § 21a.

In addition, Congress has lately declared its support for environmental legislation in the National Environmental Policy Act:

"(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components on the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner

calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. § 4331(a).

and at 42 U.S.C. § 4371 where it declares:

"(a) The Congress finds—

(1) that man has caused changes in the environment;

(2) that many of these changes may affect the relationship between man and his environment; and

(3) that population increases and urban concentration contribute directly to pollution and the degradation of our environment.

(b) (1) The Congress declares that there is a national policy for the environment which provides for the enhancement of environmental quality. This policy is evidenced by statutes heretofore enacted relating to the prevention, abatement, and control of environmental pollution, water and land resources, transportation, and economic and regional development.

(2) The primary responsibility for implementing this policy rests with State and local governments."

These statements all evidence a concern that development be carried out wherever possible so as to minimize its adverse impact on environmental quality. We find the Dredge Mining Act to be in harmony with this goal. Consequently, we conclude that the Idaho Dredge Mining Act is applicable to operators of dredge or placer mines on unpatented federal property in Idaho.

Respondents point out that several provisions of the Dredge Mining Act require acts of the owner of the land, as well as the operator of the mine. I.C. § 47-1317(e) requires the owner of the land, if different than the permittee, to endorse his approval on the application for a permit. Idaho Code § 47-1317(d) allows the costs

of an inspection to constitute a lien upon the lands specified in the permit and the minerals produced therefrom. Respondents argue that where, as here, the owner of the land is the United States Government these provisions would be invalid.

■■■■■ Appellants concede that the federal government itself would not be subject to the authority of the Idaho Act. Consequently the government need not endorse the application. Likewise, absent consent, a lien may not be asserted against the United States. *United States v. Cardinale Warehousing Corp.*, 65 F.Supp. 760 (D.N.J.1946). However, the purpose of the endorsement is to give the landowner notice of the dredge mining activities. In this respect the endorsement is for the benefit of the landowner. In any case, the federal government is not a party to this appeal and the applicability of the Act to them is not properly before us. We merely note in passing that cooperation with state governments is contemplated by the federal legislation and required by the Forest Service Regulations. In addition, where, as in this case, the lien could not attach to the land the lien could attach to the minerals themselves. I.C. § 47–1317(d).

In addition to the issues already disposed of respondents assert, as part of their counterclaim, other attacks on the constitutionality of the Idaho Dredge Mining Act. Since the district court found the entire Act interfered with Congress' property power, it deemed unnecessary a consideration of these other attacks. However, since we find the Idaho Act to be in harmony with federal legislation, we must consider respondents' other claims. In general respondents assert that the provisions of the Act as applied to them (1) constitute a taking of private property for public use without just compensation, in violation of Art. I, § 14 of the Idaho Constitution; (2) constitute a regulation of their property in excess of the state's police power; (3) constitute a deprivation of property without due process of law and

without equal protection of the law in violation of § 1 of the Fourteenth Amendment of the United States Constitution and Art. 1, § 13 of the Idaho Constitution; (4) constitute a delegation of legislative power and discretion to an administrative agency in violation of Art. 3, § 1 of the Idaho Constitution; and (5) exceed the powers granted to the state board of land commissioners by Art. 9, § 7 of the Idaho Constitution.

A determination of the first of these issues necessarily involves a determination of the next two. There is no question that the possession of a valid placer claim is a valuable property right. *State v. Finch*, 79 Idaho 275, 315 P.2d 529 (1957). The problem is whether the state's regulation of this right so cuts down its value as to require compensation to be made. If the statute prohibited respondents entirely from carrying on their business then clearly this would be a "taking." However, we have determined that the statute may not do this. Beyond that,

> "it is often a close question whether and, if so, how far the police power may be applied to regulate the operations of a property owner without making compensation. Two variable factors are to be considered: First, the extent of the public interest to be protected and, second, the extent of the regulation essential to protect that interest. [citations omitted].

> "It may be said in a given case that due process permits regulation to such extent as is necessary to protect the essential public interest involved." *Merced Dredging Co. v. Merced County*, 67 F. Supp. 598, 609 (S.D.Calif.1946).

■■■■ No question of an unconstitutional exercise of the authority granted by the Act is presented by this appeal and we must assume where applicable its provisions will not be exercised arbitrarily or unreasonably. In the present case, if the purposes of the Act are within the police power of the legislature and the means

adopted are constitutional then there is no taking of property requiring compensation. *Johnston v. Boise City*, 87 Idaho 44, 390 P.2d 291 (1964). We find that the Act meets these standards.

The Dredge Mining Act states:

"47-1312. Policy.—It is hereby declared to be the policy of the state of Idaho to protect the lands, streams and watercourses within the state, from destruction by dredge mining and by placer mining, and to preserve the same for the enjoyment, use and benefit of all of the people, and that clean water in the streams of Idaho is in the public interest."

The parties have stipulated that the objectives of the Act are to prevent: (a) pollution of state waters; (b) injury to fish and acquatic wildlife habitat in state waters; (c) removal of wildlife forage and habitat; (d) creation of aesthetically displeasing areas; (e) reduction of property values upon the tax rolls; and (f) creation of areas dangerous to the passage of persons and wildlife.

In general the enactment is within the legitimate police powers of the state if it "bears a reasonable relationship to the public health, safety, morals or general welfare." *Johnston v. Boise City, supra; see also Nebbia v. New York*, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934). A large discretion is necessarily vested in the legislature to determine what the welfare of the public requires and what measures are necessary for the promotion of the public welfare. *Maryland Coal & Realty Co. v. Bureau of Mines of State*, 193 Md. 627, 69 A.2d 471 (1949).

The purposes of the Idaho Dredge Mining Act clearly fall within this standard. Virtually identical purposes were held to be proper in *Dufour v. Maize*, 358 Pa. 309, 56 A.2d 675 (1948). *See also Maryland Coal & Realty Co. v. Bureau of Mines of State, supra.* Respondents argue that the promotion of aesthetics is not a proper purpose for the legislature to pursue. It

has frequently been held in the past that the state cannot limit or restrict the use which a person may make of his property under the guise of the police power, where the exercise of such power would be warranted solely on aesthetic considerations. This rule has come under frequent attack. *Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954); see also Boise Redevelopment Agency v. Yick Kong Corp., 94 Idaho 876, 499 P.2d 575 (1972); American Can Co. v. Oregon Liquor Control Comm'n, 15 Or.App. 618, 517 P.2d 691 (1973);* Leighty, "Aesthetics as a Legal Basis for Environmental Control," 8 Willamette Law Journal 1347 (1972). We need not decide the continued validity of that rule here, however, since "all of the authorities which have passed on the question have agreed that even though aesthetic considerations alone may not warrant police regulation, they may be taken into account where other elements are present to justify regulation, and that the fact that such considerations enter into the reasons for the passage of an act will not invalidate it, where other elements within the scope of the police power are present." 16 Am.Jur.2d Constitutional Law § 292 (1964). *See also 8 A.L.R.2d 971 § 4 (1949).*

Since we find the purposes of the legislation to be constitutional we must now examine the means adopted to achieve those purposes.

"It is not a judicial function to question whether the means adopted by legislative authority are the wisest, or whether the cost may be more than the worth. [citations omitted].

"What must concern the courts is whether the means adopted exceed the necessities of the situation to such an extent as to be arbitrary and unreasonably oppressive." *Merced Dredging Co. v. Merced County, supra* at 611.

*See also, Messerli v. Monarch Memory Gardens, Inc., 88 Idaho 88, 397 P.2d 34 (1964).*

We find the provisions of the Dredge Mining Act to be reasonably and substantially related to the legitimate police power purposes of the Act. Permit and bonding requirements are frequently a feature of enactments regulating mines and mining. *See e. g., Maryland Coal & Realty Co. v. Bureau of Mines of State, supra; Dufour v. Maize, supra; Merced Dredging Co. v. Merced County, supra.* The fact that the statute has the effect of increasing the cost of dredge mining does not make the statute unconstitutional. *Maryland Coal & Realty Co. v. Bureau of Mines of State, supra; Merced Dredging Co. v. Merced County, supra.* While there was some evidence below that in some cases a bond could not be obtained, in the present case there was no attempt to bond the property in question. The requirement that the owner of the property, where different than the permittee, endorse his approval on the application, I.C. § 47-1317(e), "is a reasonable one for the protection of the property owner, and guards the [appellant] against the necessity of determining the scope of leases purporting to grant the right to dredge another's land." *Merced Dredging Co. v. Merced County, supra* at 612. Similarly, I.C. § 47-1317(f) prohibiting transfer of permits is for the protection of both the landowner and the board of land commissioners.

The provisions allowing for inspections and requiring the cost to be born by the permittee, I.C. § 47-1317(d) are likewise valid means of enforcing the provisions of the Act. See 54 Am.Jur.2d, Mines and Minerals § 174 (1971). Respondents argue that the Act could be interpreted as allowing the board to impose a lien on a single permittee's land for the cost of inspecting all operations permitted under the Act. There is no evidence of such an interpretation here. Absent such evidence we must assume an interpretation which will give validity to the provision, i. e., that the permittee bears the cost of the inspection of his own premises only.

We also find the restoration requirements of the Act to be reasonably related to the purposes of the Act. There was evidence in the district court concerning the deleterious effects of dredge mining. There was also testimony that recontouring and revegetation could help minimize the adverse consequences of the mining. Nor are these requirements vague, as respondent has suggested. Indeed, the requirement that the land be "leveled and smoothed over reasonably comparable with the natural contour of the ground" prior to disturbance "and to a condition conducive to the growth of verdure" is strikingly similar to the language suggested by the court in *Merced Dredging Co. v. Merced County, supra* at 611.

■ Respondents point out that the Act requires compliance "within sixty (60) days after the disturbance of the ground by dredging or other placer mining has occurred, or such longer and reasonable period of time, not to exceed two (2) years, as may be granted by the director of the department of lands in any particular case, to meet land and watercourse restoration requirements." I.C. § 47-1321. Respondents do not argue that this requirement is unduly oppressive but assert that it conflicts with the requirement that topsoil be replaced "after the conclusion of the dredging operation." I.C. § 47-1314. We disagree and read I.C. § 47-1314 to be an exception to the general rule stated in I.C. § 47-1321.

Respondents argue that those provisions of the Act designed to prevent water pollution are invalid since the state's interest already is protected as to water pollution by I.C. Title 39, ch. 36. We would point out initially that the enactment antedated considerably this other enactment. In addition, a close examination of the Act reveals that no provisions of the Act are concerned solely with abatement of water pollution; rather the provisions serve several of the stated purposes of the Act.

We conclude that there has been no taking of private property which would require compensation under Art. I § 14 of the Idaho Constitution. The Act is designed to serve valid police power objectives of the state and provisions of the Act are reasonably related to the attainment of those objectives. The legislature does not seek to ban dredge mining but merely to regulate it.

Respondents argue next that several features of the Act fail to comply with the minimum procedural safeguards guaranteed by due process. Under I.C. § 47–1316 the board of land commissioners is empowered to adopt rules and regulations for the administration of the Act. *See also* I.C. § 47–1317(a). Respondents object first to the fact that the Act does not provide for a hearing upon the imposition or change of these rules. We point out initially that I.C. § 47–1316 allows the board to "conduct such hearings as the board shall deem advisable or necessary." At any rate, the adoption of rules and regulations would be covered by the procedures set forth in I.C. Title 67, ch. 52 (Administrative Procedures Act).

Respondents also object that notice and opportunity to be heard are not provided by I.C. § 47–1317(d) before the imposition of a lien. As we have pointed out such a lien would not validly apply to government property. However, the lien may be imposed against the minerals extracted by respondents. An examination of the cases reveals that the courts generally distinguish between creation of a lien and enforcement thereof. Generally it is held that the fact that no notice or hearing is provided for by a statute creating a lien before such lien attaches, does not render such statute violative of due process. 16A C.J.S. *Constitutional Law* § 631 at note 41 (1956). As was stated in *Fleming v. Mc-Ferson,* 94 Colo. 1, 28 P.2d 1013, 1015 (1933):

"Of course, no judgment foreclosing the lien could be rendered without notice to the owner and affording him an opportunity to be heard; but the due process clause does not require notice or hearing prior to the attaching of the lien."

Respondents argue next that the Act is void because it denies them equal protection of the laws. According to respondents the legislature has imposed more stringent burdens on placer and dredge miners than on open pit miners, who are regulated by the Idaho Surface Mining Act, I.C. § 47–1501 et seq.

In determining whether the Idaho Dredge Mining Act violates the equal protection guarantee the standard to be applied is that articulated in the case of *McGowan v. Maryland,* 366 U.S. 420, 425–26, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961):

"The constitutional safeguard [of equal protection] is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it."

*See also Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *Evans v. Idaho State Tax Commission,* 95 Idaho 54, 57, 501 P.2d 1054 (1972).

In the present case respondents have not presented evidence to rebut the presumption that the legislature acted within its constitutional power.[4] Respondents cannot be heard to complain "merely because the legislative body did not exert its full power

---

4. Even assuming that we should apply in this case the equal protection test annunciated in *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), the respondents have not directed our attention to any evidence which would support a finding that the alleged differences in treatment are wholly unrelated either to the objectives of the respective statutes or to differences between placer and dredge mining on the one hand and open pit mining on the other.

against all forms and methods of mining." *Merced Dredging Co. v. Merced County, supra.* As stated in *United States v. Carolene Products Co.,* 304 U.S. 144, 151, 58 S. Ct. 778, 82 L.Ed. 1234 (1938):

"The Fifth Amendment has no equal protection clause, and even that of the Fourteenth, applicable only to the states, does not compel their Legislatures to prohibit all like evils, or none. A Legislature may hit at an abuse which it has found, even though it has failed to strike at another."

Consequently, in the present case, in the absence of evidence to the contrary, we find the Act in compliance with the mandates of equal protection.

■ Respondents next object that the Act improperly delegates power to the appellant board under I.C. § 47–1317(h). We find nothing unconstitutional in the delegation of powers to the board and find it offers them sufficient standards for review.

"The police power of the State is ordinarily exercised by the Legislature, but the right to exercise the power may be delegated to an administrative agency, and the agency may delegate to subordinates the purely administrative duties incident to the power." *Maryland Coal & Realty Co. v. Bureau of Mines of State, supra* at 476.

Nor is it to be assumed the board would exercise their power here in an unreasonable and arbitrary way. Even if the board's discretion was abused the Act provides for review of any adverse decision by the board. I.C. § 47–1320. *See Maryland Coal & Realty Co. v. Bureau of Mines of State, supra.*

■ Lastly, respondents contend that the Act is void because it attempts to impose duties and burdens upon the state board of land commissioners not authorized by the constitution of the state. Article 9, § 7 of the Idaho Constitution vests the state board of land commissioners with the "direction, control and disposition of the public lands of the state, under such regulations as may be prescribed by law." According to respondents, since their claims are on national forest lands they are not on "public lands of the state" and hence the board has no jurisdiction over them.

We disagree. This section does not restrict the board to the specific purpose stated in the constitution. As stated in *St. Joe Improvement Co. v. Laumierster,* 19 Idaho 66, 70, 112 P. 683, 684 (1910):

"It must be remembered that the Legislature has plenary power in all matters of legislation except where prohibited by the Constitution, and we find nothing in the Constitution prohibiting the Legislature from imposing on the board of state land commissioners the duties imposed by said act. We therefore conclude that said act is not unconstitutional, so far as imposing additional duties on said board is concerned."

In conclusion, we find the Act valid and fully applicable to respondents. Judgment reversed and remanded to the district court for further proceedings in conformity with this opinion.

Costs to appellant.

McFADDEN, C. J., SHEPARD and BISTLINE, JJ., and SCOGGIN, D. J., retired, concur.